## Case No. 15,336.

### UNITED STATES v. HAYWARD.

#### [2 Gall. 485.] [1]

Circuit Court, D. Massachusetts.　Oct. Term, 1815.

NONIMPORTATION ACTS — REPEALS—INFORMATIONS —NEUTRAL VESSELS—BURDEN OF PROOF—PORT IN POSSESSION OF ENEMY — CASES OF ACCIDENT AND DISTRESS.

1. The repealing clauses in the act of 1814, c. 115 [2 Story's Laws, 1412; 3 Stat. 123, c. 56], did not operate strictly as repeals of the act of March 1, 1809, c. 91 [2 Story's Laws, 1114; 2 Stat. 528, c. 24], so far as revived by the act of March 2, 1811, c. 96 [2 Story's Laws, 1187; 2 Stat. 651], but as exceptions to the general provisions of those acts in favor of British goods imported in neutral vessels.

2. In an information on those acts, for an importation of goods in a vessel not neutral, quære, if it be necessary to negative in the information the neutrality of the vessel.

3. A traverse to an averment, in such an information, that the goods were imported in a vessel not neutral, merely in the negative is bad.

4. On whom the burthen of proof lies in cases within the exceptions of a statute prohibition. In cases of negative allegations, the burthen of proof rests on the party holding the affirmative, especially where the facts lie particularly in his privity and knowledge. See 1 Greenl. Ev. §§ 79, 80, and cases there cited.

[Cited in U. S. v. Twenty-Five Cases of Cloths. Case No. 16,563.]

[Cited in Doe v. Burnham, 31 N. H. 430; Raynor v. State, 62 Wis. 298, 22 N. W. 434; State v. Adams, 6 N. H. 534; State v. McGlynn, 34 N. H. 426; State v. Perkins, 53 N. H. 437; State v. Whittier, 21 Me. 349.]

5. The burthen of proof of the vessel's being neutral, in an information on the statutes before recited, rests on the claimant.

6. By the conquest and occupation of Castine by the enemy, that territory passed under the temporary allegiance and sovereignty of the enemy; and of course, the sovereignty of the United States was, during the same period, suspended, and the laws of the United States could no longer be rightfully enforced there. Castine, during such occupation, was not a port of the United States with reference to the non-importation acts. Therefore, the bringing of British goods from Halifax to Castine, during that occupation, was not an offence against those acts. See, as to what the phrase "foreign port" means, The Eliza [Case No. 4,346]; The Rhadmanthe, 1 Dod. 201.

[Cited in U. S. v. Stark. Case No. 16,378.]

[Cited in Watson v. Stone, 40 Ala. 451.]

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

[1] [Reported by John Gallison, Esq.]

7. No person can be permitted to set up the defence, that goods unladen within the 27th section of the act of March 2, 1799. c. 128 [Story's Laws, 597; 1 Stat. 648, c. 22], were unladen by unavoidable accident, necessity or distress, unless he has made the requisite proofs thereof, stated in that section, before the collector, or has been prevented by inevitable accident, &c., from furnishing such proofs.

8. It is no legal evidence of such proofs having been furnished to the collector, that he has admitted the goods to entry; nor is such entry any legal evidence of the existence of such accident, necessity or distress. The belief of the collector is no legal evidence of the existence of such accident, necessity or distress. The presumption, which the law makes in favor of the good faith and integrity of the collector, is for his own protection: but it can, in no respect, vary the rights of third persons, or change the general rules of evidence applicable to such rights.

[Cited in Bottomley v. U. S., Case No. 1,688.]

9. It is a good defence under the 50th section and 92d section of the act of March 2, 1799, c. 128 [1 Story's Laws, 573; 1 Stat. 627, c. 622], that the party has been prevented, by inevitable accident, necessity or distress, from complying with the requisitions thereof. But such defence is not allowable under a plea, which simply puts in issue a denial of the facts constituting a forfeiture within those sections.

[Distinguished in U. S. v. The Sarah B. Harris, Case No. 16,223.]

10. If the proper port of entry for the district be in possession of the enemy, the collector of the customs has a right to remove the customhouse to some other convenient port within the district, and there to admit vessels to entry. If an unlivery of a foreign vessel, at the port of entry for the district, become impossible from the port being in possession of the enemy, and such unlivery be indispensable for the preservation of the property, it may be lawfully made at a port of delivery only.

[Cited in Devato v. Eight Hundred and Twenty-Three Barrels of Plumbago, 20 Fed. 514.]

11. What constitutes a case of unavoidable accident, necessity or distress. An imminent and immediate danger of capture, &c. constitutes such a case; but not if the danger be remote, or not instant and pressing. To authorize an unlading under the 27th section of the act of 2d March. 1799. as in a case of accident, necessity or distress, the danger of capture must act directly on the goods or vessel, and the circumstances must be such, as render an immediate unlading indispensable to the safety of the goods, and not merely such as render it hazardous or impracticable to carry the goods to their port of destination.

[Error to the district court of the United States for the district of Massachusetts.]

This was a writ of error from the district court of Massachusetts, upon an information in rem against one hundred and forty-nine packages of goods seized upon land for an alleged illegal importation into the United States. The information contained six counts. The first alleged, that the goods, being articles the importation whereof into the United States, in any other than neutral vessels, was prohibited by the act entitled "An act to interdict the commercial intercourse between the United States, &c." (March 1, 1809, c. 91 [2 Story's Laws, 1114; 2 Stat. 528, c. 24]), were imported in some vessel not being a neutral vessel, the name whereof was unknown to the district attorney, into the United States, to wit, the district of Penobscot, from a place situated in a colony and dependency of Great Britain, to wit, from some place in Nova Scotia, against the statutes in such case made and provided. March 1, 1809, c. 91 [2 Story's Laws, 1114; 2 Stat. 528, c. 24]; May 1, 1810, c. 56 [2 Story's Laws, 1169; 2 Stat. 605, c. 39]; March 2. 1811, c. 96 [2 Story's Laws, 1187; 2 Stat. 651, c. 29]; April 14, 1814, c. 115 [2 Story's Laws, 1412; 3 Stat. 123, c. 56]. The second alleged, that after the arrival of said vessel from a foreign port within the limits of the United States, to wit, the district of Penobscot, and before the said vessel had come to the proper place for the discharge of her cargo or any part thereof, and before she was duly authorized by the proper officers of the customs to unlade the same, the said goods were unladen from out of said vessel for some purpose, without any unavoidable accident, necessity or distress of weather, against the statute, &c. March 2, 1799, c. 128, § 27 [1 Story's Laws, 597; 1 Stat. 648, c. 22]. The third alleged, that the goods were imported into the United States, from a port or place in the actual possession of Great Britain, in certain vessels, which were not, at the time of said importation, neutral vessels, and the said goods not being a part of the cargo of American vessels, which had cleared out for the Cape of Good Hope, &c. prior to the 10th of November, 1810, against the statutes, &c. March 1, 1809, c. 91 [2 Story's Laws, 1114; 2 Stat. 528, c. 24]. The fourth alleged, that the goods, being foreign goods, subject to duties upon importation, were brought from some foreign port or place into the United States, to wit, the district of Penobscot, in other manner than by sea, the same not having been brought into or through any district in the northern, northwestern, or western boundaries of the United States. adjoining to the dominions of Great Britain in Upper and Lower Canada, nor into or through any district on the river Ohio or Mississippi. against the statute, &c. March 2, 1799. c. 128, § 92 [1 Story's Laws, 597; 1 Stat. 648. c. 22]. The fifth alleged, that the goods, being liable to duties, were imported into the United States, from some foreign port or place, and were afterwards unladen and delivered from the vessel in the district of Penobscot without a special license or permit, against the statute, &c. March 2, 1799, c. 128, § 50 [1 Story's Laws, 617; 1 Stat. 665, c. 22]. The sixth alleged, that the goods, being of foreign growth and liable to duties, and not having been brought into or through any district on the northern, northwestern or western boundaries, of the United States, &c. were brought in some vessel from some foreign port or place into the district of Penobscot, and there unladen and landed from said vessel at a port other than a port

directed by the act of congress made and passed on the 2d of March, 1799, entitled "An act, &c." to wit, at a port called Orrington, in said district of Penobscot, against the statute, &c. March 2, 1799, c. 128, § 92 [1 Story's Laws, 656; 1 Stat. 697, c. 22].

To the first count the claimant pleaded, that the goods were imported into the district of Penobscot, on the 9th of November, 1814, in a neutral vessel called the Christina, without this, that the goods were laden and put on board of a vessel, not being a neutral vessel, with the knowledge of the master and owner of said vessel, and with intent to import the same into the United States, and that the same were imported in pursuance of such intention into the district of Penobscot in said vessel, as the United States had alleged, and thereof put himself upon the country: and the United States did the like.

To the second count he pleaded, that the goods were not unladen from any vessel for any purpose in the district of Penobscot, before the said vessel had come to the proper place for the discharge thereof, without any unavoidable accident, necessity or distress of weather, in manner, &c.: and thereof put himself on the country: and the United States did the like. To the third he pleaded, that the goods were not imported into the United States from a port or place in the actual possession of Great Britain, in vessels, which were not, at the time of such importation, neutral vessels in manner, &c.; and thereof put himself on the country: and the United States did the like. To the fourth he pleaded, that the goods were not brought from some foreign place into the district of Penobscot in other manner than by sea, contrary to the form of the statute, in manner, &c.; and thereof put himself upon the country: and the United States did the like. To the fifth he pleaded, that the goods were not unladen and delivered without a special license or permit in manner, &c.; and thereof put himself on the country: and the United States did the like. To the sixth he pleaded, that the goods were not unladen and landed from said vessel, in which they were imported from said foreign port, at a port other than a port directed by said act of congress, or any other act or law of the United States, in manner, &c.; and of this, he put himself upon the country: and the United States did the like.

Upon the trial in the district court all the issues were found in favor of the claimant, and the cause came to the circuit court upon a bill of exceptions, tendered and sealed at the trial. There was a mass of testimony and documents attached to the bill of exceptions, from which such facts and circumstances only are abstracted, as materially affect or explain the opinion of the court. It appeared, that Castine was taken possession of by the British troops, on the first of September, 1814, and was held in their possession until after the treaty of peace. After taking possession, the governor of Nova Scotia issued a proclamation claiming the whole country east of the Penobscot river, as attached to the British sovereignty by right of conquest. Orrington is on the east side of the river, but had never surrendered to the British arms, and always continued to assert and claim its American rights and privileges, and to obey the laws of the United States. After the capture of Castine, the collector removed the customhouse to Hampden, on the west side of the river, and there continued until the treaty of peace. The goods in question were bought in Halifax, Nova Scotia, on the first of October, 1814, by a Mr. John Nyman, who afterwards at Hampden, on the 11th of Nov. 1814, made a bill of sale of them to the claimant. How or when the goods were brought from Halifax did not distinctly appear; but they were found on land at Orrington, about the beginning of the same month of November, and were there seized, and soon afterwards released from seizure. They were then shipped on board of a small sloop, called the Christina, commanded by a Mr. William P. Unger, and transferred to Hampden, and were there, on or about the ninth of November, admitted to an entry by the collector of the district, as foreign goods imported in a foreign vessel from Orrington, and accordingly the foreign duties were secured, as in ordinary cases of importations from foreign ports. The sloop was American built, and was, until the 14th of October, 1814, enrolled and licensed for the coasting trade in the district of Penobscot, by the name of the Union. On that day, she was sold to Mr. Unger, the master, who called himself a Swedish subject, although it was in proof, that he had been for several years domiciled in the United States. At the time of the transportation of the goods, the sloop was navigating under a pass from Mr. Soderstrom, the Swedish consul, dated the 14th of the same October, and recognising her as entitled to the benefits of the Swedish flag, but her crew, with the exception of the master, were all Americans.

The directions of the judge, who tried the cause, are thus stated in the bill of exceptions: "The district judge did declare and deliver his opinion to the jury under the first and third counts aforesaid, that upon the evidence aforesaid they were bound to consider Orrington as in possession of the United States, and the bringing of the said goods, claimed by said Hayward, from said Orrington to Hampden, was not a violation of either of the acts on which the first and third counts in the information were founded, whatever might be the national character of the vessel, in which the said goods were so brought; that if the goods were brought to Orrington from a British port in a vessel not neutral,

they were liable to forfeiture, but that it was incumbent on the United States to prove to the satisfaction of the jury, that the vessel, in which the goods might have been brought, was not neutral; that Castine was to be considered as a foreign port, and that it was not sufficient, as to all the purposes of this libel, to entitle the United States to a verdict on these counts, to prove that the goods were brought from Halifax, a place in a British colony, to Castine, and with these directions he left the evidence upon the first and third counts to the jury. And the said judge did, then and there, deliver his opinion, and direct the said jury, that, under the other counts, it being admitted that the goods claimed were purchased at Halifax, in the province of Nova Scotia, and soon after found at Orrington, it was a fair presumption, that the goods were imported into Orrington from Halifax, no account or explanation being given by the claimant; that the goods must have been brought thither either by land or by sea; if by land, they were liable to forfeiture under the fourth count; if by sea, the goods were liable to forfeiture under the second, fifth and sixth counts, unless the case should be found by the jury to be a case within the purview of the 27th section of the act, entitled 'An act to regulate the collection of duties upon imports and tonnage,' and they should acquit the goods upon the ground of unavoidable accident, necessity, or distress of weather, according to the terms of the exception contained in that section of the said act, which the jury might do, although the specific evidence of such unavoidable accident, necessity or distress of weather, which is pointed out by the said twenty-seventh section of the said act, had not been shown on the trial; and that, if the jury should so acquit the goods, upon the said last mentioned grounds, on the second count, it would be their duty to acquit them also upon the fifth and sixth counts in the information; that as the goods had been admitted to an entry by the collector at Hampden, it would be competent for the jury to presume from that circumstance, not only that the goods were unladen through unavoidable accident, necessity, or distress of weather, but that notice thereof was given to the collector at Hampden, and oath made before the said collector, agreeably to the requisition of the twenty-seventh section of the act aforesaid, though such presumption might indeed be repelled by facts and circumstances, given or appearing in evidence in the cause. And the said judge did, then and there, furthermore deliver it as his opinion, and accordingly direct the jury, that inasmuch as the government of the United States had, prior to the importation in question, manifested by a proclamation from the president of the United States, and by a repeal of the non-importation acts theretofore existing, a strong disposition to encourage importations of merchan-

dize in neutral vessels; and as there was existing, at the time of this importation, a blockade by the enemy of all the ports in the eastern country, and as the only port of entry in the district of Penobscot was then actually in the military possession of the enemy, whereby the approach of neutral vessels to the ports in that section of the country in the usual and ordinary course was rendered extremely hazardous, if not actually impracticable; an emergency arising from such a state of things might, in reference to the importation in question, fairly be considered by the jury, as constituting a case of unavoidable 'accident, necessity, and distress,' within the fair intent and meaning of the exception in the 27th section of the fact before mentioned. And if the jury should find reason to believe that the goods in question were, under such circumstances, considered by the collector as innocently or excusably landed at Orrington under the 27th section of the act aforesaid, and were thereupon admitted to entry, that condemnation could not now be had in this prosecution, for that cause. And with the above directions, as to the second, fourth, fifth and sixth counts to the jury, the said judge left with them the cause."

Mr. Blake, Dist. Atty., argued in support of the exceptions, and Prescott & Hubbard, contra.

Blake & Richardson, for the United States.
Prescott & Hubbard, for claimant.

STORY, Circuit Justice.    Several exceptions have been taken in the argument to the directions of the court. It is contended in behalf of the United States, that the charge as to the first and third counts is erroneous, (1) because, under the circumstances, it was not incumbent on the United States to prove, that the vessel, in which the goods might have been brought, was not neutral; (2) because it was sufficient to maintain these counts, to prove that the goods were brought from Halifax to Castine.

In order to understand the first of these objections, it is necessary to review the provisions of the acts, upon which these counts are founded. The act of the 1st of March, 1809, c. 91, § 4 [2 Story's Laws, 1114; 2 Stat. 528, c. 24], provides, that "it shall not be lawful to import into the United States, or the territories thereof, any goods, wares or merchandise whatever from any port or place situated in Great Britain or Ireland, or in any of the colonies or dependencies of Great Britain, nor from any port or place situated in France, or in any of her colonies or dependencies, nor from any port or place in the actual possession of either Great Britain or France. Nor shall it be lawful to import into the United States, or the territories thereof, from any foreign port or place whatever, any goods, wares or merchandise whatever, being of the growth, produce or manufacture of

France, or of any of her colonies or dependencies, or being of the growth, produce or manufacture of Great Britain or Ireland, or any of the colonies or dependencies of Great Britain, or being of the growth, produce or manufacture of any place or country in the actual possession of either France or Great Britain."—The first clause, therefore, prohibits the importation of any goods whatever from the British dominions and possessions, and on this the first and third counts are founded. The only substantial difference between these counts is, that in the first the goods are alleged to be imported from a place in a colony or dependency of Great Britain; in the third, from a place in the actual possession of Great Britain. The second clause prohibits the importation of goods of British growth or manufacture, from any foreign port or place whatever. This act was repealed, as to Great Britain, by the president's proclamation issued under the 11th section of the act, which repeal was confirmed by the act of the 28th of June, 1809, c. 9; and the whole act expired by its own limitation on the first day of May, 1810. The act of 1st of May, 1810, c. 56, § 4 [2 Story's Laws, 1169; 2 Stat. 605, c. 39], authorized the president to revive certain sections (including that already recited) against Great Britain or France, in case of a revocation of the edicts of either, which violated our neutral commerce. And accordingly, by the president's proclamation, these sections were revived against Great Britain, to take effect on the 2d of February, 1811; and the act of 2d of March, 1811, c. 96, § 3 [2 Story's Laws, 1187; 2 Stat. 651, c. 29], confirmed this revival, and directed these sections to be immediately carried into effect "against Great Britain, her colonies and dependencies." These sections accordingly remained in full force, until by the act of 14th of April, 1814, c. 115 [2 Story's Laws, 1412; 3 Stat. 123, c. 56], it was enacted, "that so much of any act or acts, as prohibits the importation of goods, wares or merchandise, of the growth, produce or manufacture of Great Britain or Ireland, or of any of the colonies or dependencies thereof, or of any place or country in the actual possession of Great Britain, and so much of any act or acts as prohibits importation into the United States or the territories thereof, in neutral ships or vessels, from any port or place situated in Great Britain or Ireland, or in any of the colonies of Great Britain, be and the same is hereby repealed," with a proviso, prohibiting any importation of goods, the property of the enemies of the United States.

Much difficulty has resulted from this inartificial mode of legislation. It is oftentimes a subject of peculiar embarrassment, as well as delicacy, to give a consistent construction to language so loose, as that employed to designate the revival and repeal of the above mentioned acts. The language of the provisions of the act of 1809, c. 91 [2 Story's Laws, 1114; 2 Stat. 528, c. 24], is directed against Great Britain and France, their colonies and dependencies, and places in the actual possession of either. The act of 1811, c. 96 [2 Story's Laws, 1187; 2 Stat. 651, c. 29], revives these provisions as to "Great Britain, her colonies and dependencies" only, leaving out the words "places in the actual possession of Great Britain." To give any construction, therefore, to this act, we must in fact strike out of the act of 1809, every word relating to France, her colonies and dependencies, and perhaps also to all places in the actual possession of France or Great Britain. This is indeed a perilous procedure, and it is not quite certain, that it can, in all cases, be done, and yet preserve the sense and integrity of the text. But the act of 1814, c. 115 [2 Story's Laws, 1412; 3 Stat. 123, c. 56], is yet more embarrassing. The first clause, which has been cited, explicitly repeals the second clause of the fourth section of the act of 1809, c. 91 [2 Story's Laws, 1114; 2 Stat. 528, c. 24]. And yet it is very clear from the proviso, that the legislature meant to except importations upon account of the enemies of the United States. British goods imported into the United States during the war, upon British account, must still be deemed within the penalties of the act of 1809, (and of course the act must remain in force for this purpose,) as well as be subject to the forfeitures arising from the law of war.

In respect to the second repealing clause of the act of 1814, there is yet more difficulty; for there is no part of any act of congress, which, in terms, prohibits importations in neutral vessels, from Great Britain, her colonies or dependencies. Construing the clause, therefore, in its literal sense, it is utterly void, for there is no descriptio rerum, if I may so say, to which it can attach. To give it any legal effect, we must construe it, not as a repeal of any existing provision, but as a qualification or exception, enabling neutral vessels, notwithstanding the existing laws, to import goods from Great Britain and her colonies. And, in this view, it operates as a proviso upon the first clause of the fourth section of the act of 1809, c. 91. In aid, therefore, of the manifest intention of the legislature, however incautiously expressed, we must deem both of the repealing clauses of the act of 1814, c. 115, not as repeals of the act of 1809, but as positive exceptions to the general provisions of that act. Upon any other construction, the act of 1809 would be completely repealed, even as to cases directly excepted from the repealing clauses, to wit, importations in vessels not neutral, and of goods the property of enemies. But, upon the construction now stated, all the words have an effect, and the objection urged at the argument is avoided, (viz. that British and American vessels are not now authorized to import British goods) because, by the treaty of peace, the charac-

ter of enemy is extinguished, and the British and Americans must be held neutral to each other.

Having thus settled the construction of the acts, on which the first and third counts are founded, we may now recur to the objections already stated to the charge of the court.

The first objection depends upon the solution of the point, upon whom the burthen of proof rested, as to the neutrality of the vessel, in which the goods were imported. It is very doubtful, whether it was necessary, in the count, to allege that the goods were imported in a vessel not neutral; for the general rule of law is, that it is sufficient to negative the exceptions in the enacting clause of a statute, and exceptions, which come in by way of proviso, or in subsequent statutes, are properly matter of defence for the defendant. Rex v. Jarvis, 1 Burrows, 148, 1 East. 643. note; Spieres v. Parker, 1 Term R. 141; Rex v. Stone, 1 East, 639; Rex v. Pemberton, 2 Burrows, 1035. The present case seems to fall within the rule, and is not easily, if at all, distinguishable. But it is not necessary to decide this point, because the count does, in fact, negative the vessel's being neutral.

It is argued on behalf of the United States, that, notwithstanding the averment, the defendant is bound to prove the affirmative, because in his first plea he has expressly alleged, that the goods were imported in a neutral vessel, called the Christina. But this averment is mere inducement to a traverse of the averment in the first count. In general, the inducement to a traverse is not of itself traversable; much less is the matter of it to be proved in any issue founded upon the traverse. In the present case, the traverse was intended to deny the whole of the material averment in the count, and accordingly it concludes to the country. To be sure, it was open to the objection of being too broad in its terms, and not sufficiently pointed to the averment in the count, and perhaps also of putting in issue a negative allegation; but these objections were available only upon demurrer. and the attorney for the United States, by joining the issue, has waived the benefit of them. By the mere shape of the pleadings, therefore, the onus probandi is not thrown upon the claimant.

Is it thrown upon him by the rules of law applicable to a case of this nature? In general, the party claiming a forfeiture or penalty is bound to make out his case precisely. Nor it is a necessary exception, that it involves the proof of a negative allegation. For if the law presume the affirmative, the party may still be put to the proof of the negative. Gilb. Ev. 146; Wilson v. Hodges, 2 East, 312; Frontine v. Frost, 3 Bos. & P. 302. Therefore, if the charge consist in a criminal neglect of duty. as the law presumes the affirmative. the burthen of proof of the contrary is thrown on the other side. Williams v. East India Co.. 3 East, 192; Bull.

N. P. 198; Frontine v. Frost, 3 Bos. & P. 302. But in other cases, as where the negative does not admit of direct proof, or the facts lie more immediately within the knowledge of the defendant, he is put to his proof of the affirmative. And where the general facts, which constitute a forfeiture within a statute, are proved, and there are exceptions to its operation in particular cases, the better opinion certainly is, that the party, who would avail himself of the exception, must prove it; although from the forms of pleading it may be necessary to negative every exception in the indictment or information. Such negative allegation is, in such cases, to be repelled by affirmative proof on the other side. Therefore, in an action on the game laws, (which must negative that the. party has any of the qualifications of the statute) it is not incumbent on the plaintiff to prove the disqualifications of the defendant; for this is negative matter, and the affirmative comes more properly in the defence. Rex v. Stone, 1 East, 639; Frontine v. Frost. 3 Bos. & P. 307, note b; Rex v. Crowther, 1 Term R. 125; Spieres v. Parker, Id. 141; Attorney General v. Sheriff. Forrest, 43; Rex v. Turner, 5 Maule & S. 206.

Let us compare the present case with these rules. The act of 1809 prohibited all importations of goods from British ports. The act of 1814 excepted importations from British ports in neutral vessels. From the evidence in the case it does not appear, that the plaintiffs knew in what vessel the importation was made, but this was a fact peculiarly within the knowledge of the defendant. Besides, the fact of importation being proved, from a British port into the port of Orrington, (which must be taken as a necessary preliminary, so far as respects this part of the charge of the court) the case fell within the general words of the act of 1809, the exception, that they were imported in a neutral ship, was properly matter of defence. The law did not presume that the vessel was neutral in favor of the defendant. The charge was not against the defendant personally of a criminal neglect of duty, but against the goods only. of a positive act, to wit, an illegal importation. And to call upon the plaintiffs to prove that the vessel was not neutral, was to require the proof of a negative allegation, which the plaintiffs had no means in their power to prove. and proofs of the contrary of which. if they existed, were within the reach of the defendant. I cannot distinguish the present case in principle from those, which have been decided on the game laws. There. the declaration must allege. that the defendant is not duly qualified, negativing specifically all the exceptions of the statute; and yet it seems admitted, that if the act of killing game be proved, the burthen of proof of his being within the exceptions of the statute is thrown on the defendant. It is perhaps not easy to reconcile with these decisions some of the general doc-

trines stated in some of the authorities. Such, for instance, as the doctrine, that wherever the charge involves criminality, the law will not easily suppose it; and therefore, if the charge contains a negative, the law will presume the affirmative without proof. If this were universally true, then, under the game laws, the proof of the not being qualified ought to be shown by the plaintiff, for the charge is clearly of a criminal nature. Without pretending to reconcile all the dicta in the books, it seems to me, that in respect to negative allegations, the reasonable rule is, that the burthen of proof shall rest on the party, who holds the affirmative; and especially where the facts are peculiarly within his privity and cognizance: and that this rule applies more strongly, where the party seeks to shelter himself under an exception, which was not incorporated into the original prohibition of the statute creating the offence. See Attorney General v. Sheriff, Forrest, 43. An exception may, perhaps, properly hold, where the charge substantially consists in a criminal neglect or omission of duty. It seems to me, therefore, that the burthen of proof, in the case at bar, that the vessel in which the goods were imported was neutral, lay on the claimant and not on the United States, and that in this respect the charge of the learned judge was erroneous.

The second objection is, that the court directed the jury, that Castine was, under the circumstances, a foreign port. By "foreign port," as the terms are here used, may be understood a port within the dominions of a foreign sovereign, and without the dominions of the United States. The port of Castine is the port of entry for the district of Penobscot, and is within the acknowledged territory of the United States. But, at the time referred to in the bill of exceptions, it had been captured, and was in the open and exclusive possession of the enemy. By the conquest and occupation of Castine, that territory passed under the allegiance and sovereignty of the enemy. See Dod. 451. The sovereignty of the United States over the territory was, of course, suspended, and the laws of the United States could no longer be rightfully enforced, or be obligatory upon the inhabitants, who remained and submitted to the conquerors. Castine, therefore, could not, strictly speaking, be deemed a port of the United States; for its sovereignty no longer extended over the place. Nor, on the other hand, could it, strictly speaking, be deemed a port within the dominions of Great Britain, for it had not permanently passed under her sovereignty. The right which existed was the mere right of superior force, the allegiance was temporary, and the possession not that firm possession, which gives to the conqueror plenum dominium et utile, the complete and perfect ownership of property. It could only be by a renunciation in a treaty of peace, or by possession so long and permanent, as should afford conclusive proof, that the territory was altogether abandoned by its sovereign, or had been irretrievably subdued, that it could be considered as incorporated into the dominions of the British sovereign. Until such incorporation, by a recapture or repossession, the territory would be entitled to the full benefit of the law of postliminy. If then by the term "foreign port" were intended a port absolutely within the dominions of a foreign sovereign, and incorporated into his realm, it might be very doubtful, if the direction of the court could be sustained. But it seems to me, that taking the whole direction together, in reference to the first and third counts, it meant no more, than that Castine, being in the possession of the enemy by right of conquest, it was no longer to be considered as a port of the United States, with reference to the non-importation acts, but that, so far as respected the obligatory force of the laws of the United States, it was to be considered a "foreign port," or port "extra ligeantiam rei-publicæ." And in this view the direction may well, in point of law, be supported.

This leads me to the third objection, viz. that the bringing of the goods from Halifax to Castine was sufficient to all purposes, to entitle the United States to a verdict on the first and third counts, whereas the court directed the jury to the contrary. Without stopping to examine, whether the single fact of bringing the goods from Halifax to Castine was of itself, "to all the purposes of this libel," sufficient to entitle the United States to a verdict on these counts, as the opinion guardedly expresses it, let us attend to the substance of the objection. It rests altogether upon the assumption, that Castine was to be deemed a port of the United States, in which the laws had their full operation, notwithstanding it was, at the time of the supposed importation, in the actual possession of Great Britain. This position, however, is utterly inadmissible upon every principle of the law of nations. By the conquest and occupation, the laws of the United States were necessarily suspended in Castine; and by their surrender the inhabitants became subject to such laws, and such laws only, as the conquerors chose to impose. No other laws could, in the nature of things, be obligatory upon them, for where there is no protection or sovereignty, there can be no claim to obedience. This objection, therefore, must be also overruled.

The next exception is to the instruction of the court to the jury in respect to the second, fifth and sixth counts. It is argued, that this instruction is erroneous, because the court directed the jury: (1) That the jury might acquit the goods upon the ground of unavoidable accident, necessity or distress of weather, although the specific evidence thereof, which is pointed out in the 27th section of the collection act (March 2, 1799, c. 128), had not been shown on the

trial. (2) That, as the goods had been admitted to an entry by the collector, they might presume from that circumstance. not only that the goods were unladen through unavoidable accident, necessity or distress of weather, but that notice thereof was given to the collector at Hampden, and oath made before him agreeably to the requisitions of the 27th section of the collection act of 2d of March, 1799, c. 128, whereas no such presumption could be legally made. (3) That if they should acquit the goods upon the ground of unavoidable accident, necessity or distress of weather, upon the second count. it was their duty to acquit them also upon the fifth and sixth counts, whereas no such legal consequence followed. (4) That considering the president's proclamation inviting neutral trade, the repeal of the non-importation acts, the blockade of the whole eastern coast of the United States by the enemy, the military possession of Castine by the enemy, which was the only port of entry of the district of Penobscot, whereby the approach of neutral vessels was rendered extremely hazardous, if not impracticable; an emergency arising in such a state of things might, in reference to the importation in question, be deemed as a case of unavoidable accident, necessity and distress, within the intent and meaning of the said 27th section of the act aforesaid.

To understand these objections, it will be necessary to advert to the acts, upon which the second, fifth and sixth counts are founded, and to the points put in issue by the pleadings to the same counts. The second is founded on the 27th section of the act of 2d of March, 1799, c. 128, which provides, that if, after the arrival of any ship laden with foreign goods and bound to the United States, within the limits of any of the districts of the United States, or within four leagues of the coast thereof, any part of the cargo shall be unladen. for any purpose whatsoever, from out of such ship, before such ship shall come to the proper place for the discharge of her cargo or some part thereof; and shall be duly authorised. by the proper officer of the customs. to unlade the same, the master, &c. shall forfeit. &c., and the goods so unladen shall be forfeited and lost, except in the case of some unavoidable accident, necessity or distress of weather; of which unavoidable accident, necessity or distress of weather the master, &c. shall give notice to. and together with two or more of the officers or mariners. &c. on board such ship. shall make proof upon oath before the collector, &c. of the customs of the district, within which such accident. necessity or distress shall happen, &c. &c. The count charges that the goods were so unladen without any unavoidable accident. necessity or distress of weather; and the plea alleges. that the goods were not so unladen without any unavoidable acci-

dent, necessity or distress of weather, and concludes to the country. This is plainly, a negative traverse, and would have been bad upon special demurrer, but is aided by the joinder of the issue.

The first objection supposes, that the proofs, required to be made before the collector, of the unavoidable accident, necessity or distress, were indispensable prerequisites. to entitle the claimant to avail himself of such defence. At the argument, the inclination of my mind was strongly against the validity of this objection. It struck me, that it sounded harsh, to deprive the party of his defence at common law, unless the proofs had been made pursuant to the 27th section of the statute. But, upon further reflection, that opinion has been changed. The prohibition of unlading goods without unavoidable accident, &c. was intended to guard the revenue against the fraudulent practice of smuggling. To prevent impositions under false and frivolous pretences of accident, &c. it was deemed proper to interpose as a check, that the facts should be immediately notified and proved before the collector. But the whole object of the provision would be completely defeated, if the party might wantonly omit to give such proofs, and yet avail himself of the defence. It seems necessary. therefore, to effectuate the manifest intention of the act, to hold, that a compliance with these requisites should alone entitle the party to the benefit of the exception. And this construction is corroborated by the 28th section, where the notification and proof, to be made before the collector, are incorporated into the very terms of the exception.

Nor is it any hardship upon the party, to deprive him of a defence, which he has not chosen originally to set up and establish, and in respect to which he has been guilty of a culpable omission of duty. If, indeed, inevitable accident, necessity or distress, prevent a compliance with the law, or the collector refuse to receive the proofs, the party ought not to be prejudiced, and will be restored to his defence. All, that is required, is good faith and diligence. Nor are the proofs so made before the collector conclusive upon any party. It is still competent to the United States to show, that the transaction is founded in fraud, and that the accident, necessity and distress, is a mere fiction ingeniously contrived to cover an illegal traffic. And, on the other hand, it is competent for the claimant, at the trial, to supply any defect of his former proofs, and relieve the cause from every shadow of suspicion. Still, however, the law puts the burthen of proof of the accident. necessity or distress, upon the party, who would avail himself of the defence; and, if he has not complied with the directions of the act, by making the proofs before the collector, and does not satisfactorily explain and excuse the omission, it makes a conclusive pre-

sumption against him. The opinion, therefore, of the district judge, that the jury might acquit upon the ground of unavoidable accident, necessity or distress, although the specific evidence stated in the act was not produced, though, under circumstances, it might be correct, is stated in too broad and unqualified a manner; and this objection of the counsel for the United States must therefore prevail.

The second objection seems as well founded. The law presumes, that every public officer does his duty; and therefore it will not impute to him, without evidence, a voluntary and known deviation from it; much less, a connivance in any illegal transactions. But the law does not go further, and in favor of third persons impute to the collector a knowledge of all the facts attending an importation, of which facts he might be reasonably ignorant; much less, does it impute to him knowledge of a special defence, of which no proofs appear to have been submitted to his inspection. And if the law were otherwise, the mere circumstance, that a collector, acting bona fide, in the discharge of his office, believed in the existence of such facts, is no legal proof or presumption of their actual existence before a court or jury, to whom the question is submitted. The presumption, which the law makes in favor of the good faith and integrity of the collector, is for his own protection; but it can, in no respect, vary the rights of third persons, or change the general rules of evidence applicable to such rights. If the collector be not satisfied of the existence of any unavoidable accident, necessity or distress, his opinion raises no legal presumption against the truth of the defence; nor can it be admitted in evidence for this purpose. And the same rule must equally apply in the converse case. The opinions of third persons are not admissible, to prejudice the rights of parties litigating before judicial tribunals. In the present case, the collector admitted the goods to an entry; and it is, therefore, a fair presumption, that, at the time, he knew of no illegality in the importation. But I cannot yield to the doctrine, that from this entry alone, it is to be presumed, that the goods had been unladen from unavoidable accident, necessity or distress, or that the requisite oaths, and proofs thereof, were made before the collector. If it had been shown, that such a defence had been set up before the collector, and that, after a full knowledge and inquiry, he had admitted the goods to entry, there might have been reason to hold, that the collector was satisfied of that fact: and that the requisite proofs were made before him. Even then his opinion would not be legal evidence of the fact upon the trial of this information. But the opinion of the learned judge of the district court does not contain even this qualification. It imputes to the entry per se a legal effect as evidence, which does not seem to

me properly to belong to the act of any ministerial officer. The collector may have acted innocently, though erroneously, in admitting the goods to entry; and it is more consistent with the facts in evidence, to presume that he acted under a mistake of law, viz. that Orrington, as well as Castine, was a foreign port, from which goods might be imported into the United States; than to presume that the goods were unladen from unavoidable accident, necessity or distress, when there is no evidence, that such a defence was set up before him. At all events, if the admission to an entry would support both presumptions, the instruction to the jury, which confined it to one, cannot be supported. And upon the more general ground, which has been stated, I am also of opinion that it was erroneous.

We are now led to the third objection, which is to the charge of the court, that if the goods were landed from unavoidable accident, necessity or distress, and the jury acquitted them on that ground on the second count, they were bound to acquit them also under the fifth and sixth counts. The fifth count is founded on the 50th section of the act of 2d of March, 1799, c. 128, which provides, that if any goods shall be unladen from any vessel, without a special license or permit, they shall be forfeited. The count alleges, that the goods were unladen and delivered without a special license or permit. The plea contains a negative traverse, viz. that the goods were not unladen or delivered without a special license or permit; and concludes to the country; and upon this plea issue was joined. The sixth count is founded on the 92d section of the act of 2d of March, 1799, c. 128, which provides, that, exception in certain districts, no foreign goods shall be brought into the United States from any foreign port or place in any other manner, than by sea, &c.; nor shall be landed or unladen at any other port, than is directed by the same act, under the penalty of forfeiture. The count alleges, that the goods were unladen and landed at a port, other than a port directed by the act of congress. The plea traverses the allegation negatively, viz. that the goods were not unladen and landed at a port other than a port directed by the said act of congress; and concludes to the country; and issue is joined thereon.

It is contended on behalf of the claimant, that the plea of unavoidable accident, necessity or distress of weather, is a good defence under every provision of the revenue laws, whether it be specially stated in the public statutes or not; and in support of this argument, the case of Peisch v. Ware, 4 Cranch [8 U. S.] 347, is cited, as directly in point. To the doctrine there stated by the court, I cordially subscribe, "that it is unquestionably a correct legal principle, that a forfeiture can only be applied to those cases, in which the means, that are prescribed for the prevention of a forfeiture, may be em-

ployed." And therefore, it is clear, that where these means cannot be employed from unavoidable accident necessity or distress of weather, the party is exempted from forfeiture under the 50th section and 92d section of the act of 1799. But the difficulty, in the present case, is not in the principle of law, but in its application to the issues between the parties on the fifth and sixth counts. The single point in issue on the fifth count was whether the goods were unladen without a permit; and on the sixth count, whether they were unladen at a port not authorized by the act of congress. No question could legally arise under those issues, as to the excuse of unavoidable accident, necessity or distress of weather. The question was, whether the unlivery was in fact made without a permit, or in an unauthorized port, and not whether the omission was excused or justified by accident or necessity. With reference, therefore, to the issues between the parties, the proof of unavoidable accident, necessity or distress, could not legally authorize an acquittal. Such proof was completely dehors the record. The opinion of the district court on this point must therefore be overruled. There can be no doubt, that that opinion was delivered upon the general principle of law without reference to the pleadings, to which the attention of the court below was not probably directed by the counsel at the trial, as indeed it has not been at the argument in this court. The point of view, in which that opinion has been principally contested here, is in applying the general principle to cases within the 92d section of the act of 1799.

Hitherto, the opinion of the district court has been considered as referring to an unlading at Orrington. But, as the language of it is general, the counsel for the United States have argued, that it is too broad, and that the unlading at Hampden was equally within the purview of the second, fifth and sixth counts, and especially of the latter; because it is not a port, at which vessels from foreign ports could be admitted to make an entry, nor at which foreign vessels could be admitted to unlade at all. In the view, which has already been taken of this case, it may be not be absolutely necessary to decide this point. But, as it has been fully argued, and there are several other causes, in which it is presented, in this court and the court below, and a decision is very much pressed, it may not be unfit to decide it. By the act of congress (March 2, 1799, c. 128, § 2), Castine is declared to be the only port of entry for the district of Penobscot. and Frankfort. Bluehill. Hampden and Deer Island, are annexed to said district. as ports of delivery only. By the same act (section 18), no entry is to be allowed of any vessel from a foreign port elsewhere than at a port of entry. nor any cargo to be unladen elsewhere than at a port of delivery; and none but ships or vessels of the United States are admitted to unlade. except at certain specified ports. among which Hampden is not enumerated, but Penobscot is. Before the act of 1799, the collection of duties was regulated by the act of 4th of August, 1790. c. 35 [1 Stat. 145]. Under this last act, Penobscot was the port of entry for the district, and was enumerated among the ports, at which foreign vessels might unlade. In the intermediate time between the passing of these two acts, the township of Penobscot was divided by an act of the legislature of Massachusetts (Act Feb. 10, 1796. 2 Mass. Sp. Laws). into two distinct towns, and the southerly part of it was incorporated by the name of Castine. leaving the residue of the old town a corporation under its old name. It is not necessary to decide, whether Castine, under these circumstances, was a port, at which foreign vessels might ordinarily unlade; but it is very clear, that if admitted at all, foreign vessels must have made entry at Castine, for that was the only port of entry for the district; and could not unlade at Hampden, for that was not a port of delivery for this purpose. If, therefore, the case fell within the ordinary rules, an entry at Hampden was an illegal act, and a permit to unlade there equally illegal, and of course utterly void. But by the occupation of Castine by the enemy. the laws of the United States were suspended there, and it was no longer a port of entry for any purpose connected with those laws. Under such circumstances of superior force the collector was bound to remove the custom-house to some other convenient place within the district. He was not at liberty to refuse an entry of any vessel entitled to make it, for such vessels had a right to unlade their cargoes at the ports of delivery within the district; and. as the vis major prevented the exercise of his authority in the proper place, the doctrine, analogous to that of cy pres, applied to the case. Suppose Castine had been sunk by an earthquake, and there was a physical, as well as moral, impossibility of making an entry there. could it be pretended that an entry could not be admitted by the collector at any other port in the district? The provisions of the law presuppose a moral, as well as physical, possibility of complying with them; and in this respect are directory to all parties; but if a literal compliance be impracticable from the presence of superior force, or unavoidable accident, necessity or distress. it stands excused upon the principles of law. as well as the immutable dictates of justice. And the same observations apply to the unlivery at Hampden. for if it became indispensable for the preservation of the property. and the proper port was morally inaccessible. whether it was Penobscot or Castine. or both, such unlivery would stand excused or justified in the same manner. Upon the supposition. therefore. that such an uncontrollable necessity or vis ma-

jor existed, the collector's act, in admitting even a foreign vessel to entry, and to unlivery at Hampden, was not an illegal act, but stands completely justified.

If then the instruction of the district court could be applied to the entry and unlivery at Hampden, so far as it stands upon the general principles of law, independent of the pleadings, it might have been difficult to shake it.

The last objection is to that part of the instruction of the court, which declared certain circumstances, therein enumerated, as constituting a case of unavoidable accident, necessity and distress, within the 27th section of the act of 1799, ch. 128. The circumstances enumerated are: (1) The encouragement held out to importations in neutral vessels by the president's proclamation, and the repeal of the non-importation acts; (2) the blockade by the enemy of all the ports in the eastern country: and (3) the actual military occupation by the enemy of the only port of entry in the district, whereby the approach of neutral vessels to the ports in that section of the country was rendered extremely hazardous, if not actually impracticable. As I understand the charge, and as it was understood at the argument by the counsel, the learned judge considered these circumstances as constituting per se a case of unavoidable accident, necessity and distress, within the statute, and entitling the goods to an acquittal upon the second, fourth, fifth and sixth counts. For the reasons, which have been already stated in reference to the pleadings, this direction cannot be supported, as to the fourth, fifth and sixth counts; for no question, as to such accident, necessity or distress, was in issue between the parties. It remains, therefore, to be considered with reference to the pleadings on the second count.

It has been urged on behalf of the United States, that the only excuse, admitted by the statute, is of marine accidents, or necessities occasioned by stress of weather. But the words of the statute do not admit or require this narrow interpretation. They apply to any unavoidable accident or necessity, arising from any other cause, as well as from distress of weather. And there can be no doubt, that a capture by an enemy is an unavoidable accident or necessity, casus fortuitus, within the purview of the clause. And an unlivery, occasioned by an actual capture, or an imminent and pressing danger of immediate capture, which left no time or opportunity to obtain authority from the proper officers, would be just as good a justification, as if it were occasioned by a tempest or a shipwreck. But it is not sufficient to constitute a case of unlivery by unavoidable accident, necessity or distress, that there is danger of a capture or a tempest. The danger must be immediate, and operating directly on the subject matter. The peril must be so instant and pressing as to leave no hope of escape, or of preserving the property

by ordinary means, or by delay for the ordinary authority; for in no other case, can it be considered as unavoidable. And there is great force in the argument of the counsel for the United States, that the accident, necessity or distress, intended by the 27th section of the statute, is such as renders it indispensable to unlade the goods immediately, and not merely such, as renders it hazardous or impracticable to carry the goods to their port of destination. In short, that it must be an accident, necessity or distress, affecting the condition of the ship or goods, and not the voyage merely; for, in the latter case, the unlivery may still be duly authorized by the proper officer of the customs. What is it, that the accident, necessity or distress excuses? Not the proceeding on the voyage, for that the party may always legally abandon; not the unlivery merely, but the unlivery without being duly authorized by the proper officers of the customs. If, therefore, there be time and opportunity to procure such authority, and it is not done, the party cannot shelter himself behind this section of the statute. Now it seems to me, that neither the blockade of the eastern ports, nor the military possession of Castine, were of themselves perils operating directly and immediately upon the goods in this case, so as to present an immediate necessity for their unlivery, without being authorized by the proper officer of the customs. There might have been danger of capture by delay, but it was remote; and the excuse, quia timet, is not such an excuse, as is contemplated in the statute. The blockade of the coast, and the military possession of Castine, might, with other pressing circumstances of accident or injury, have combined to form a case within the statute, but of themselves they could not constitute one. These could not but be known to be the ordinary perils of the voyage, and would, of themselves, no more justify or excuse an unlivery of the goods at one place, than at another. And the policy of the law would be completely defeated, if, after an arrival within the limits of the United States, goods could be unladen without proper authority, because they might be otherwise exposed to capture by the enemy, when no instant and pressing necessity existed, to prevent an application for such authority. In the present case too, there seems less reason for the application of the principle; for, as the goods were brought from Halifax in a manner wholly unexplained in the evidence, the presumption of the danger of capture was not so great as in ordinary cases, and the case was left open to the suggestion, stated by counsel, that they might have been imported under the protection, or by the connivance of the enemy. However, I lay no stress on this suggestion, but for the other reasons, which have been previously urged. I feel myself compelled to overrule the opinion of the district court upon this point.

Upon the whole. the judgment of the district court must be reversed, and a new trial had at the bar of this court.