The case made by the parties, showed that in 1862 the County authorities, pursuing the provisions of the Ordinance of Dec. 6th, 1861, borrowed a large sum of money from the plaintiff, in order, as was known to the plaintiff, to procure salt for the families of soldiers in the Confederate army, and for other destitute persons. The money was duly applied as designed. In 1867 the debt was recognized by the County, and having been scaled, was secured by notes, for about $1,267. Shortly afterwards $500 of this was paid.
The question was as to the liability of the County for a debt contracted for such a purpose.
His Honor gave judgment for the plaintiff; and the defendants appealed.
I. A preliminary question is, What was the relation between North Carolina and the United States when this contract was made?
(a.) In Thorington v. Smith, 8 Wall. 1, It is settled that it was a de facto government, and that its civil administration was lawful, and it was the duty of the citizen to observe the laws of a (517) peaceful character.
(b.) In U.S. v. Rice, 4 Wheat. 246, and in U.S. v. Hayward, 2 Gall. 485, and in Wheat. Int. Nat. Law, 337 and 345, 346, it is held that the conquest and military occupation of part of our territory by the public enemy, makes it foreign territory and subject to the laws arising out of that relation.
(c.) In the Sarah Starr, Bl. Prize cases, 69, it is settled that for all purposes of the war, it was a war with a foreign power, and involved all the usual consequences of international wars.
(d.) In the cases of the Union Ins. Co. v. U.S., 6 Wall. 759, andArmstrong's Foundry, 6 Wall. 766, it is decided that the laws of captureand prize apply to the Acts of Confiscation of rebel property, — otherwise, the law of nations.
(e.) And in Shanks v. Dupont, 3 Pet. 260, it is held that the relation between the body politic and its members, continues the same, notwithstanding a change of government.
1. From these authorities are deduced clearly these conclusions: That we had a civil government in North Carolina competent to enact all civil laws not belligerent to the United States.
2. And that the law of nations governed the conduct of the war between the State and the United States. *Page 405 
3. They establish this further principle, if our case required it, that the law of nations, which is part of the common law, is as obligatory upon a nation dealing with its own subjects, as with foreign nations.
II. The second position, and main one, is, that this contract is not forbidden by the law of nations, or the law which governs a nation at war with its own subjects, in a state of rebellion, of the magnitude and acknowledged character of this.
The uniform decisions of the Courts of all nations for many ages, and the writings of eminent jurists, have settled what acts and things, constitute that "aid to a war," which is forbidden, (518) so as to become the subject of judicial cognizance.
If two nations go to war, it is the duty of all others to stand off, and furnish no aid to either. If, however, the subjects of another government do furnish supplies calculated and intended to aid one party in the prosecution of the war, these supplies are called "contraband of war," and become the subject of capture and prize.
The term contraband then embraces and was intended to embrace, every act or thing which is in "aid of" a war or rebellion, in a legal sense.
What then is contraband of war?
All merchandize is divided into three classes:
1. Articles manufactured and primarily and exclusively used for military purposes, in time of war:
2. Articles which may be and are used for purposes of war of peace, according to circumstances:
3. Articles exclusively used for peaceful purposes.
Provisions belong to the second class, and is our case. As to these the rule is, that they are contraband only when actually destined to the military or naval use of the belligerents. Wheaton Int. Law pp. 376-81. 1Kent. Com. Com. pp. 134-41. The Peterhoff, 5 Wall. 58.
From these cases and the text books, is clearly derived this proposition, that salt is never contraband or in aid of war, unlessactually destined to the military use of the belligerents, as, to a besieged place, or the army.
Take the illustration in Leak v. Commissioners of RichmondCounty, ante 132; Grant intercepts provisions going into Vicksburg,a beseiged town. They are clearly contraband. But if Vicksburg had not been besieged, and no hostile army there, it is equally clear, they would not be contraband. (519)
But we are met by the case of Texas v. White, et al., 7 Wall. 739. We admit this to be good law, but it has no application *Page 406 
here, because the facts are totally different from our case, and the point here, did not arise there.
It is established, then, that the purchase of salt for the people of the county, was an act, lawful and innocent in itself; and he who affirms the contrary, must show it. We do not rest our case here, as we might, but assume the affirmative of establishing our innocence in fact.
The acts of Assembly are divisible into two classes: 1st. those in aidof the war, which are void, and 2nd, those of civil administration, which are valid, as settled in Thorington v. Smith. Note the facts in detail.
1. It is an "act for the supply of salt," and confined to that one purpose of distribution among the home people, without any reference to a military purpose, as in the Texas case.
2. No act touching military supplies was passed the same day or week, or in reference to it, as in the Texas case.
3. The Legislature observed the distinction between acts of a military and civil nature, and the Captions so designate them, generally, or the body of the act does. So much for the Legislature. Now as to the county:
1. The county is not sovereign, and has only limited delegated powers. Being a mere subordinate agent, the agent may be innocent, although the principal is guilty. Here all the facts establish the unwarlike and innocent purpose of the county.
2. The loan was made twelve months after the act, under the pressure of necessity, "great scarcity, and the people were in great need of salt," the case states. The motive then was not war, (520) but, to supply the urgent wants of our nature.
3. The most scrupulous provision was made to secure an equal and uniform distribution among all, black and white, at home, thus rebutting all hostile purpose.
4. The county passed no act of secession, no "series of war measures," but was a subordinate fraction of the State, and bound, willing or not, to obey; and without power to resist the State.
But the county might be guilty, and the plaintiff not. Look at him:
1. He was not in military service, and had no connection with the war. "What does not appear, does not exist. "
2. His act was involuntary, the county went to him to borrow.
3. The county agent merely stated to him, that he wanted the salt for the people of the county — a non-military purpose.
4. No guilty knowledge of an unlawful purpose on his part, is shown. He was not bound to know a void act of the Legislature, and no actual notice is proved. *Page 407 
5. Finally, the claim is audited and allowed by the county Court in 1867.
Then, why should not this debt be paid?
If a famine had occurred in time of peace, (and history is full of instances,) a civil government, which folded its hands, stood aloof and said to the sufferers, "perish!" would have been looked upon by all mankind with horror and detestation. Is the duty less sacred, because the famine is in consequence of war and rebellion, and the government is de facto, and not de jure?
The distinction is one that the moral sentiment of mankind can never approve, and is unwarranted by authority.
The doctrine of what is "aid" to rebellion, may be carried so far as to contravene all the traditions and history of free government, and crush the very genius of liberty itself. (521)
It is an error which I am sure this Court will avoid.
The question is, Was the action of the wrongful State government, and of the county authorities, in respect to the manufacture of salt, and its distribution among the people during the war, in aid of the rebellion. This matter is fully discussed in Leak v. Commissioners of Richmond Co., ante 132, and the Court does not feel called on by any view of the question presented on the argument, to discuss it a second time. The full and learned argument of Mr. Bynum established the position that salt, except under special circumstances, is not contraband of war, and may, according to the law of nations, be furnished by citizens of a neutral nation to a belligerent, in the ordinary way of commerce. This position is not in point, and does not hit our case, — that of citizens owing allegiance to the government, aiding a rebellion. It is conceded in the authorities cited by Mr. Bynum, that in case of a blockade, — an attempt to introduce salt or other provisions, violates the law of nations, and the articles are lawful prizes; for the reason, that by the blockade, it is proclaimed to the world that starvation is resorted to as one of the means of compelling peace, and this being recognised by the law of nations as a means that a belligerent may resort to, any one venturing to run the blockade, does so at his peril. This doctrine is in point.
It was forcibly said by Mr. Bragg: "The late war was conducted on a scale of magnificent proportions. The whole South was in a state of siege — a blockade and military possession of ports, on the east and south! arms, on the north and west"
So, of course, the manufacture and distribution of salt by the wrongful authorities in possession of the State government, and the wrongful county authorities, was in contravention of the *Page 408 
(522) avowed policy of the government of the United States, and in aid of the rebellion, as tending to protract the struggle.
The position, that the action of the Justices in 1867, and the partial payments made to the plaintiff, ratified or confirmed the original transaction, is not tenable. An illegal act cannot be ratified or confirmed. The attempt to do so is itself illegal, and it may be a question whether the plaintiff and the Justices are not liable to a claim on the part of the county for the amount of county funds thus received without lawful authority, the payment by a county, city or town of any debt contracted directly or indirectly in aid of the rebellion, being forbidden by law.
There is error.
Per curiam.
Venire de novo.
Cited: Smitherman v. Sanders, 64 N.C. 524; Logan v. Plummer, 70 N.C. 392;Brickell v. Comrs., 81 N.C. 243.