# THE STATE v. MILLER, Appellant.

**Division Two, June 14, 1904.**

1. **ATTEMPT TO BRIBE: Tender of Money.** The statute making it an attempt to bribe "by giving or offering to give any gift or gratuity whatever," to any juror, etc., does not require that the offer must be by an actual tender of money or other thing, but if the corruptor by words proposes to give, the statute is violated. The words of the statute mean a proposal or declaration of a willingness to give a bribe or gratuity to bias a juror's verdict, whether the proposed gift is money, or land, or employment, or other thing.

2. ———: **Sufficiency of Evidence.** It is held that the evidence in this case is sufficient to show an attempt by one juror to bribe another to render a verdict for a street railway in the trial of a damage suit.

3. ———: **Accessory After the Fact: Evidence.** A juror had attempted to bribe a fellow juror to aid in rendering a verdict for a street railway in a damage suit, and the trial judge had confronted them with each other in his chambers. The next morning the newspapers contained an account of the exposure. That morning three employees of the company were in consultation in the law office of the company's attorneys, one of them the claim agent, another the defendant. From the general office of the company a two-seated rig was ordered from a livery stable by telephone, and these three and the juror drove to a town about eighteen miles away, reaching there about four o'clock, and when the six o'clock train came along, the juror took the train and escaped, and immediately the three employees started back for the city, the defendant paying the liveryman there for feeding the horses, and the bill for the rig was paid by the company on its presentation at the end of the month. The only ostensible and credible purpose of the trip to the town was shown to be to enable the juror to board a train without taking passage at the union station in the city. *Held,* that this evidence was sufficient to convict defendant as accessory after the fact to the juror's attempt to bribe, by aiding him to escape and avoid arrest.

4. ———: ———: **Relationship to Principal: Exceptions.** Where the defendant in his application for a continuance swears that he "did not know" the principal in the crime, it is not necessary for the State to go further and prove by other witnesses that

the principal he was aiding to escape did not stand in any of the degrees of relationship mentioned in the statute as exempting the offender from prosecution for aiding a criminal to escape.

5. ———: ———: ———: ———: Allegation: Burden of Proof. It is necessary that the indictment aver that the defendant was not any such relative of the principal in the crime as the statute exculpates for aiding a criminal to escape or avoid arrest. But the knowledge of such relationship as would, under the statute, excuse the accessory from aiding the principal to escape, is within the peculiar knowledge of the defendant, and can be established without any inconvenience, and the burden is on him to show that relationship.

Appeal from Johnson Circuit Court.—*Hon. W. L. Jarrott*, Judge.

AFFIRMED.

*J. W. Suddath* with *Hugh C. Brady* for appellant.

(1) Criminal and penal statutes are to be strictly construed in all parts which are against defendants, but liberally construed in those which are in their favor. State v. Bryant, 90 Mo. 537; State v. Gritzner, 134 Mo. 527; State v. Howard, 137 Mo. 297; State v. McCance, 110 Mo. 406; State v. McLain, 49 Mo. App. 400. (2) To offer is: "To bring or put forward; to hold out for acceptance; to present for acceptance or rejection; to tender or make tender of; to come into view, or to be at hand." Century Dictionary, vol. 4, p. 4090. "To present as an act of worship; to bring to or before; to hold out to; to present for acceptance or rejection; as, to offer a present or a bribe; to present itself; to be at hand." Webster's International Dictionary. "To tender; to present for acceptance or refusal; to proffer; as to offer one's hand, to offer a book." Worcester's Dictionary. (3) There is a distinction between offering and promising a bribe or reward. State v. Harker, 4 Harr. (Del.) 559; 17 Am. and Eng. Ency. Law (1 Ed.), p. 39; Morrison v. Springer, 15 Iowa 327; Chase v. Miller, 41 Pa. St. 419. (4) Defendant must be specifically brought

within all the material words of the statute; nothing can be taken by intendment. State v. Miller, 132 Mo. 297; State v. Sekrit, 130 Mo. 401; State v. Austin, 113 Mo. 538. (5) In order to convict the State must prove, first, the principal's guilt; second, the principal's effort to escape to avoid arrest; third, defendant's knowledge of the principal's guilt; fourth, defendant's knowledge of the principal's intent to escape; fifth, defendant's assistance for the purpose of aiding the principal to escape; sixth, defendant's non-relationship within degree fixed by statutes; and a failure in either entitles defendant to acquittal. R. S. 1899, sec 2365; State v. Reed, 85 Mo. 194; Loyd v. State, 42 Ga. 221.

*Edward C. Crow*, Attorney-General, *Sam. B. Jeffries*, Assistant Attorney-General, *C. D. Corum*, *Herbert S. Hadley* and *Wm. H. Wallace* for the State.

(1) The whole legal tender idea of counsel is erroneous. The statute was fully construed by this court in State v. Williams, 136 Mo. 393. The indictment was copied from the indictment in that case which was held good. Counsel seems to think that because Judge SHERWOOD in that opinion talks about the common law offense of embracery, he went outside of the statute to sustain the conviction of Williams on the theory that he had violated the common law. The decision is based upon the statute and upon an indictment which he says follows the statute and is good. In 21 Am. and Eng. Ency. of Law, p. 832, the definition of the word "offer" is given as "a proposition to do a thing;" it is sometimes a convertible term with attempt, and the following well-known cases are cited in support of these definitions: People v. Ah Fook, 62 Cal. 494; Riggs v. Dennison, 3 Johns. Cas. (N. Y.) 202; Willis v. Standard Oil Co., 50 Minn. 296; Commonwealth v. Harris, 1 Leg. Cas. (Pa.) 455. (2) Woodward was trying to make his escape to avoid arrest. The whole evidence overwhelm-

ingly shows this. (3) Miller undoubtedly knew that Woodward had attempted to bribe the jurors.

GANTT, P. J.—On June 22, 1901, the defendant, Robert R. Miller, was indicted by the grand jury of Jackson county for having on the twenty-sixth day of April, 1901, been an accessory after the fact to the attempt to bribe one Elisha Dancy, a juror in a certain case then pending in the circuit court of Jackson county, wherein Mary H. Walton was plaintiff and the Metropolitan Street Railway of Kansas City was defendant.

The indictment omitting the caption and formal parts is as follows:

"The grand jurors for the State of Missouri, in and for the body of the county of Jackson, upon their oath present that Grant Woodward, whose Christian name in full is unknown to these jurors, late of the county aforesaid, on the twenty-sixth day of April, 1901, at the county of Jackson, State of Missouri, a certain jury of said county, being then and there duly summoned, returned, impaneled and sworn to try a certain issue joined in a certain civil action between Mary H. Walton, plaintiff, and the Metropolitan Street Railway Company, a corporation organized and existing according to law, defendant, then depending and on trial in the circuit court in and for Jackson county, Missouri, at Kansas City, Missouri, and in Division Number Two, the said Division Number Two then and there having jurisdiction of said civil action, and the said Grant Woodward then and there well knowing the premises and facts aforesaid, and that one Elisha Dancy was one of the said jurors of the said jury aforesaid, and the said Grant Woodward corruptly and wickedly and feloniously intending then and there to hinder and prevent a just and fair trial of said issue in said civil action by said jury, did then and there unlawfully, knowingly, willfully, corruptly and feloniously attempt to corrupt the said Elisha Dancy

who had been then and there duly summoned, impaneled and sworn as one of the jurors of the said jury aforesaid, by then and there unlawfully, knowingly, willfully, corruptly and feloniously offering to give said Elisha Dancy a certain gift and gratuity, to-wit, the sum of ten dollars, lawful money of the United States, of the value of ten dollars, with the felonious intent to bias the mind of the said Elisha Dancy, and incline him to be more favorable to the side of the defendant than to the side of the plaintiff aforesaid in the trial and decision of the said issue so joined and on trial before said jury as aforesaid, and the grand jury upon their oath aforesaid do say that one Robert R. Miller, well knowing the said Grant Woodward to have done and committed the felony and bribery of a juror in manner and form aforesaid, afterwards, to-wit, on the twenty-sixth day of April, 1901, at the county of Jackson and State of Missouri, him the said Grant Woodward did feloniously receive, conceal, harbor, aid, assist and maintain with the felonious intent and in order that he, the said Grant Woodward, might make his escape and avoid arrest, trial, conviction and punishment; he, the said Robert R. Miller, then and there not standing in the relation of husband or wife, parent or grandparent, child or grandchild, brother or sister by consanguinity or affinity to the said Grant Woodward; against the peace and dignity of the State.''

The defendant was duly arraigned on the fifth day of July, 1901, and entered his plea of not guilty, and on the twenty-third of November, 1901, at the September term, 1901, the defendant applied for and obtained an order changing the venue to Johnson county, Missouri. The cause reached the Johnson circuit court, and was set down for trial at the June term, 1902, of said court, but on the application of defendant, a continuance was granted to the October term, 1902, of said court, and the cause set specially for October 20, 1902. On the twenty-fifth of November, 1902, the defendant by

his attorneys again prayed for a continuance on account of the absence of a witness. On the next day the record recites the calling of defendant and his failure to appear, and a forfeiture of his recognizance was taken, and writs of *scire facias* directed to issue against his sureties, and a *capias* ordered for the arrest of defendant.

On the twenty-fifth of February, 1903, the defendant appeared in court and the cause was set down for April 6, 1903, and defendant recognized to appear on that day, and from day to day and term to term. On the sixth day of April, 1903, the cause was reached, a jury impaneled and the trial begun and on the eighth day of April, 1903, the defendant was convicted and his punishment assessed at a fine of $500, and one year's imprisonment in the county jail. In due time he filed his motions for a new trial and in arrest of judgment, and the same having been seen and heard, were by the court overruled and the defendant sentenced in accordance with the verdict. An appeal was granted to this court and the defendant was recognized to abide the judgment of this court. Leave was given defendant to file his bill of exceptions on or before August the 10th, 1903, and the said bill of exceptions was duly signed by the judge and filed August 5, 1903.

On the trial, evidence was offered by the State tending to prove the following facts:

H. G. Henley, the clerk of the circuit court of Jackson county, identified the amended petition filed by plaintiff in the circuit court of Jackson county in the case of Mary H. Walton against the Metropolitan Street Railway Company, as one of the files of his office. The petition alleged negligence to the plaintiff in managing and operating its cars by defendant; her injury therefrom, and a prayer for damages. The other records of that court were offered and identified and read to the jury down to and including the impaneling of the jury, the hearing of the evidence, the giving of the instructions, and argument of the counsel and an order permitting the

jury to separate until 9:30 o'clock on April 26, 1901, and on the twenty-sixth of April a recital of the failure of the jury to agree, and their discharge.

From the recital of the impaneling of the jury it appears that Grant Woodward and Elisha Dancy were two of the jurors selected and sworn to try said cause.

Finis C. Farr, Esq., a member of the Kansas City bar, was sworn as a witness and testified that on the morning that the jury were directed to return to consider their verdict, the cause was finally submitted to them and they retired in charge of the sheriff. About 4:30 o'clock in the afternoon he was summoned to appear before Judge Slover, in whose division the case was on trial. When the jury reported they could not agree they were discharged. Thereupon Judge Slover called Andrew Miller, the foreman of the jury, up to the bench and took a list of names from him, and requested Andrew Miller, Elisha Dancy, Mr. Joseph Gephart and Grant Woodward, all members of the jury, and Mr. Crane, the attorney for the Metropolitan who had represented it in said Walton case, and Mr. Farr, to accompany the judge to his chambers. The official stenographer, Mr. Jones, also went. When all of the above-named parties had come into Judge Slover's chambers, the judge, in the presence of Grant Woodward and all the rest, stated that he had information from the foreman of the jury that an attempt had been made to bribe certain members of the jury in the case just tried to return a verdict for the Metropolitan Street Railway Company. He then requested Mr. Miller to make his statement. Miller made a statement of what Dancy had reported to him, to the effect that Woodward had attempted to bribe him, Dancy. Thereupon, Judge Slover asked Woodward what he had to say. Thereupon, Woodward didn't say much. He was very much excited and called for water frequently. Then the court requested Dancy to make his statement. Dancy said that Woodward had offered him ten dollars to vote for

a verdict for the Metropolitan; that he had tried to make an appointment with him, Dancy, to meet him. He, said Woodward, first broached the subject while the eighteen jurors were being examined on their *voir dire;* said there wasn't much in serving on a jury at a dollar and a half a day, and asked Dancy if he was there for his health. At another time during the proceedings Woodward said plaintiff didn't have any money; that there wasn't as much money on that side as there was on the Metropolitan's side and if he, Dancy, would do right in the matter of bringing in a verdict, he would see that he got paid for it. At the conclusion of Dancy's statement, the judge again asked Woodward what he had to say in reply to that statement. Woodward said he didn't know he tried to bribe anybody. He said he had solicited the interviews with Dancy, and he had said there was nothing in serving as a juror at a dollar and a half a day. He said that one or more of the interviews he sought with Dancy were for the purpose of having him meet Mr. Church, who, Woodward said, was claim agent of the Metropolitan. Church was present, watching the trial very closely. Dancy had stated in Woodward's presence that Woodward had asked him to meet Mr. Church, the claim agent of the defendant in that case, and Mr. Farr asked Woodward why he wanted Dancy and Gephart to meet Church. He said he wanted them to know him. ''Why did you want them to know him?'' He answered, ''So they would know him when they saw him.'' Woodward was not under arrest when this meeting was had in Judge Slover's office. After the interview we all left. Judge Slover directed Woodward to come back next morning with the balance of the panel. He did not come next morning. Woodward and Dancy were on the regular panel for that term.

Elisha Dancy testified he had lived in Kansas City eleven years. Was one of the regular panel in Judge Slover's division of the circuit court at the April term, 1901. He was one of the jurors in the Walton case v.

the Metropolitan Railway Company. Grant Woodward was also a juror in that case. Woodward said to him when they were examined as to their competency, "What are you here for, for your health?" "I told him I was there to perform my duty as a juror." This was on Wednesday. "At noon on Thursday, the next day, I was going down the steps of the courthouse and he caught up with me and asked me where I was going to dinner. I told him up to a relative's at Eighth and Walnut. He said he would walk with me. When we got a little ways from the courthouse, he says to me, 'They have got no case at all have they?' I told him I didn't know, I hadn't heard the testimony. He says, 'They have got no case and no money on that side. The other side has got some money and you had just as well have a little piece as anybody.' I told him I never done anything of that kind. He said, 'Now don't be foolish, you had just as well have a little bit of that money as not.' He wanted to know if I couldn't meet him over at Hannan and Dixon's saloon that evening about half past eight. I told him I didn't know—my boy was attending to the work and I would have to help him. He had a list of the names of the jurors on a paper. He asked me my name and I told him Dancy. He looked on the paper and said, 'Oh yes. It don't matter much about this case, we have got enough men fixed for this.' He had the names marked or checked." Thursday evening as they walked up the street Dancy asked Woodward who a certain man was, and he said, "That is Mr. Church, that is the man who will fix it up with you." The juror Dancy had seen Church around the courtroom. Next morning Dancy encountered Woodward in the hall of the courthouse. He said to him, "You didn't meet me?" and Dancy said he couldn't. Woodward then said, "I have ten dollars as soon as this case is decided. This is a small case, the larger ones are twenty-five dollars." "I says, 'I can't do it.' 'Do what?' As soon as this case was decided if I would do

the right thing for the Metropolitan. I told him I couldn't do it and went on in." Witness then detailed the dismissal of the jury, and judge's order for Gephart, Miller, Woodward and himself to go to his chambers. Everything said there was in the presence of Grant Woodward. He had an opportunity to make his statement to Judge Slover. "Woodward did not exhibit the money to me when he offered me the ten dollars. He said he had it for me as soon as the case was decided."

Gephart, a member of the same jury, testified that Woodward told him there was ten dollars in the case if he decided it for the Metropolitan, and endeavored to make an appointment with him to meet him at a saloon.

W. E. Eylar testified he was in the livery business in Kansas City and deputy county marshal. On the day after the charges were made of bribery in the Walton case, the Metropolitan Cable Company called for a trap and team by telephone. I sent the team to Fifteenth and Main streets. I sent it to the Metropolitan office—a black team, open trap, painted red, rubber tire, two-seated rig. This was in the morning. The team got back that night. The Metropolitan paid for it.

This officer had the warrant that was issued for defendant Miller. He searched for him in Jackson county for two or three weeks. Called up Leavenworth and told chief of police to look out for him. "I met him at the depot when they brought him back from Leavenworth."

Samuel Lowe lived at Blue Springs, Jackson county. On the twenty-seventh of April, 1901, the defendant Miller, Mr. Church, Grant Woodward and Mr. Finucane drove a team to his barn in Blue Springs—a black team, and a rubber-tired, red-painted trap, without a top. Got there about four o'clock. I didn't know Woodward. He was introduced to me under another name. Miller and Church were on the front seat. The team was put up at my stable. They asked where they could get supper and I pointed out the hotel. I next saw them when

the train came in about six o'clock. They told me to have the team hitched up and down at the depot when the train came—the Chicago and Alton, going east—the Slater accommodation the only train that stops there going east. When I got to the station I saw defendant Miller on the platform and the other three with him. I stayed until the train pulled out. Woodward left on that train and the other three got in the trap and started to Kansas City. Woodward had a clothes grip. They shook hands with him and told him to take care of himself. They started and I said, "Mr. Church, you haven't paid me," and Miller, the defendant, inquired what the charge was, and I told him and he paid me. Some four other residents of Blue Springs saw Woodward, Church, Finucane and defendant in Blue Springs on April 27, 1901.

Mr. Eylar, recalled, testified to trying to arrest Woodward for some days and couldn't find him—all the force were notified to catch him.

W. E. Brown, an architect in Kansas City, testified to having offices adjoining Messrs. Crane & Oldham, who were attorneys for the Metropolitan in April, 1901, and represented the company in the Walton case. He knew defendant Miller. Saw him most every day in Messrs. Crane & Oldham's offices. Knows Church, saw him there also frequently. Hannan & Dixon's saloon was right across the street from this office. Remembers the charge of bribing in connection with the Walton case. It came out in the papers next morning. I think I saw both Miller and Church in the office of Crane & Oldham that morning, and I spoke to Mr. Church about the charge and to Mr. Oldham and Crane. I don't remember speaking to Miller, but he was there that day. Hardly think he was present. Witness was talking to Church, Crane and Oldham about the bribery charge.

The State offered in evidence the order of forfeiture in the case of State v. Miller.

W. E. Brown testified that defendant Miller told

him he was in the claim department of the Metropolitan company. Miller continued to be at the office of Crane and Oldham until this bribery matter came up. Mr. Perdue, an attorney, testified he had an office on same floor with Oldham and Crane and frequently went into their office about claims. Often saw Miller, the defendant, in there. Remembered seeing Mr. Oldham give him a bunch of subpoenaes and of his telling him to serve them, and defendant said, ''You know I will go day and night until I get them.'' The evidence of Eylar, the deputy marshal, was that the marshal had warrants for Church and Finucane, but had never been able to find them.

The State offered a sworn statement of defendant in an application for a continuance ''that defendant did not know who Woodward was,'' when defendant and Finucane went to Blue Springs on a fishing trip on the twenty-seventh of April, 1901.

Mr. Henshaw testified that Grant Woodward was a man thirty to thirty-five years old. Alexander Woodward, his father, was between sixty and sixty-five years old. The defendant is a man forty years of age, may be, forty-five.

At the close of the State's case, defendant moved for an instruction directing the jury to acquit him, which the court overruled.

The defendant offered the record showing the date of the return of the indictment against Grant Woodward to have been May 3, 1901, and that Grant Woodward was arraigned on the same day. Also that the defendant was indicted in this case on the twenty-second day of June, 1901, and gave bond July 5, 1901.

On the other hand, Mr. Hadley, who was prosecuting attorney at the time, testified to efforts made under his direction, by the sheriff's and marshal's deputies, to locate Grant Woodward, and their inability to do so.

For the defendant, the circuit court instructed the jury that before they could find defendant guilty under

the indictment in this case, they must believe beyond a reasonable doubt:

First, that Woodward was guilty of offering to bribe a juror.

Second, that defendant knew Woodward had committed the crime.

Third, that Woodward attempted to avoid arrest.

Fourth, that the defendant knew that Woodward was attempting to avoid arrest.

Fifth, that Miller aided and assisted Woodward to escape that he might avoid trial and conviction.

Sixth, that the defendant did not stand in relation of husband or wife, parent or child, grandparent or grandchild, brother or sister, by consanguinity or affinity to the defendant.

I. Was there sufficient evidence to justify the jury in finding that Grant Woodward was guilty of knowingly, corruptly and feloniously attempting to corrupt the juror Elisha Dancy, by corruptly offering to give to said Elisha Dancy ten dollars, with the intent to bias and incline him, the said Dancy, to be more favorable in his verdict to the defendant in the case of Mary H. Walton against the Metropolitan Street Railway Company than to the said plaintiff?

It is first to be observed that the indictment as to Woodward is bottomed upon section 2043, Revised Statutes 1899, which is in these words: "Every person who shall corrupt, or attempt to corrupt, any other person summoned or sworn as a juror, appointed a referee or chosen an arbitrator, by giving *or offering to give* any gift or gratuity whatsoever, with the intent to bias the mind of such juror, referee or arbitrator, or incline him to be more favorable to one side than the other, in relation to any cause, matter or proceeding which may be pending in the court to which said juror shall have been summoned or in which said referee or arbitrator shall have been chosen or appointed, shall on conviction be punished as in the next preceding section is prescribed."

The preceding section provides for punishment not exceeding five years in the penitentiary or in the county jail not less than six months, or by a fine of not less than five hundred dollars, or by a fine of not less than one hundred dollars and imprisonment in the county jail not less than three months.'' [R. S. 1899, sec. 2042.]

The learned counsel for defendant, by inadvertence, quotes the indictment as charging the defendant with ''willfully, corruptly and feloniously *offering* to him, the said Elisha Dancy, a certain gift and gratuity to-wit—$10,'' etc., whereas the indictment charges him with ''offering to give to said Dancy,'' etc.

The indictment is in the language of the statute and conforms to the indictment in State v. Williams, 136 Mo. 303, which met our approval, and is sufficient.    The charge in this indictment, just as in the Williams case, is ''attempted bribery''—the language of the indictment being, ''did then and there unlawfully, knowingly, willfully, corruptly and feloniously *attempt to* corrupt the said Elisha Dancy, etc., by offering to give to him the said Dancy a certain gift,'' etc.    Based upon the words ''by offering to him,'' and the evidence of Dancy that Woodward did not exhibit the ten dollars or any other sum of money, in other words, did not *tender* the money to him, it is urgently insisted that no offense was committed by Woodward, because he interprets the statute to mean a tender or presenting the money so that Dancy could have accepted or rejected it, which he argues could only have been done by an exhibition of the money to him.

We think this contention is a total misconception of the statute and contrary both to its language and spirit. In Williams' case, 136 Mo. 293, Williams said to Dickenson, the juror, ''that if he would keep quiet, and was retained on the jury panel of twelve, and would hang the jury or bring in a verdict of not guilty, he would see him well paid; that he could afford to leave the farm and sit upon that jury and hang it.''    Not only was

there no actual tender, but the amount was not mentioned, and yet we all agreed such conduct brought the defendant clearly within the statute. Judge SHERWOOD, speaking for the court, said: "The crime of which defendant was convicted was known at common law, and is an ancient offense. It was entitled 'embracery.' It consists in all such practices as tend corruptly to influence a juror. The crime is made up of the attempt thus to influence a juror. Upon such attempt being made, whether successful or not, the crime is consummate. The *corpus delicti*, the body, essence and substance of the offense being the corrupt attempt, it is wholly immaterial whether the would-be corruptor gains his point or not, or whether the juror thus approached gives any verdict or not, or whether the verdict be true or false." [2 Bish. New Crim. Law, secs. 384, 344, et seq.; 2 Archbold's Crim. Prac., 906.]

The construction of this statute can not be based upon the word "offering" segregated from the context in which it is found. It must be read as it is written, "by giving or offering *to give* any gift," etc. These words do not mean that only those who make a legal tender of their bribe can be guilty of a violation of this highly salutary statute. We are required by the statute (section 4160, R. S. 1899) to construe "words in their plain, ordinary and usual sense," and we are not to look for obsolete and remote definitions.

Words must be interpreted by the connection in which they are used, and the expression "by offering to give any gift or gratuity" can not with reason be limited to a strict legal tender when we consider the purpose the lawmakers had in view, to-wit, the prevention of all attempts to corruptly bias the mind of the juror sworn or summoned to act as an impartial trier of a cause. In the connection in which these words are found, we construe them to mean a proposal and declaration of a willingness to give a bribe or gratuity to bias the juror's verdict.

In 2 Bouvier's Law Dictionary, 327, the definition of offer is "a proposal to do a thing," and such is the natural sense in which it is used here.   Without further elaboration, because we think the expression was correctly construed in Williams' case, it need only be added that it takes no stretch of the imagination to conceive of the offer being a piece of land, regular employment at good wages, in neither of which legal tender, as contended for by defendant, would be possible, and yet who can doubt that such an offer would prove equally as seductive and as clearly violative of the statute as a direct legal tender of money?

We are both unwilling and unable to bring ourselves to believe that the Legislature intended to punish those only who attempt to bribe a juror by making a legal tender of the bribe.   The crime denounced by the statute is one of the most heinous in its consequences.   The perpetrator of it seeks to poison the very foundations of justice and debauch the courts themselves.   The statute wisely punishes the attempt because, be it said to the credit of our jurors, the cases are very rare in which a juror has been found to listen with approval to a proposition to forswear himself and return a corrupt verdict.

The essence and substance of the crime is the corrupt attempt, whether it succeeds or not, and we hold that the words "offering to give" do not require that an actual exhibition and tender of the bribe shall attend the corrupt attempt to bribe the juror.   To hold that a legal tender must accompany every attempt to bribe in order to render the briber amenable to this statute, would be to emasculate it.   In the future, the legal tender would never be made, but the nefarious practice would proceed with a new impetus.   No corruptionist flaunts his money in the face of the man he proposes to bribe.   He moves in an insidious way to ascertain the moral strength of his victim and it is only

when he feels sure of his game that he produces the actual bribe. We think the statute is amply sufficient to cover the offer to give a bribe by Grant Woodward to the juror Dancy, and if the evidence of Dancy was believed by the jury, they were fully warranted in finding the first predicate of their verdict in this case, to-wit, that Woodward was gulty of attempting to bribe Dancy.

II.   Was there sufficient evidence from which the jury could find that the defendant knew that Woodward had committed the offense? The evidence on this point may be summarized. Church, Miller, the defendant herein, and Finucane were all employees of the Metropolitan Street Railway Company. The evidence shows that Church was a constant attendant upon the trial of Mrs. Walton's case against the Company in Judge Slover's court, so prominent in fact as to have attracted the attention of the juror, Dancy, who was led to inquire of Woodward who he was. Mr. Crane, of the firm of Crane & Oldham, was present in Judge Slover's chambers when the exposure of Woodward's attempt to bribe first came to light.  Messrs. Crane & Oldham had an office in the New York Life Building, and the defendant Miller was a constant attendant at their office and an employee of their client, the Metropolitan. Prior to the disclosure in Judge Slover's chambers of the attempt to bribe the juror, there is not a scintilla of evidence even tending to show that Messrs. Crane & Oldham had any knowledge that such an attempt had been made or would be made, and it is a pleasure and a duty to note that there is not the most infinitesimal evidence that in the slightest degree reflects upon their professional honor and integrity, but Mr. Crane was present and heard the statements of the jurors before Judge Slover Friday afternoon. On the next morning, the morning papers had published the scandal, and Mr. Brown, the architect, who had rooms adjoining Messrs. Crane & Oldham, was in their office, and there were present Messrs. Crane and Oldham, Mr. Brown and Church and then

and there the disclosures of the previous afternoon were discussed by these four. Miller was in there that day and while Mr. Brown was not able to state that Miller took any part in their discussion of the attempted bribery or was near enough to hear it, still he says Miller was in the office that day and the other evidence shows it must have been in the morning.

On this same morning, the twenty-seventh day of April, 1901, the day after the bribery, a call was sent from the Metropolitan's general office at Fifteenth and Main streets to Eylar's livery stable by telephone for a two-seated rig to be sent to the general office. That same morning, Church, Finucane, Grant Woodward and Miller, the defendant, were seen in that trap or rig driving east to Blue Springs, a village some twenty miles east of Kansas City, in Jackson county, at which there is a station of the Chicago & Alton railroad. This party of four in this trap reached Blue Springs about four o'clock that afternoon. A number of witnesses identified the party as the same that were there in Blue Springs that afternoon. They put their team in Mr. Lowe's livery barn, and directed him to have it at the station that afternoon when the train going east came in. At about six o'clock Lowe took the team over to the station and saw defendant, Miller, and Woodward there. When the train pulled in Grant Woodward, carrying his grip, boarded it for the east. After the train left, the remaining three, Church, Finucane and Miller, got into the trap, and Miller paid Lowe for feeding the team, and they started west on the rock road toward Kansas City, and the team reached Eylar's stable about eight or nine o'clock that night. Church and Finucane were sworn to be fugitives from justice and defendant Miller was arrested at Leavenworth, Kansas, and brought back to Kansas City some days later. It thus appears that three of the party were employees of the Metropolitan, and the fourth, Grant Woodward, the juror who had attempted to bribe his

fellow juror, Dancy. The livery bill was paid for by the Metropolitan, the first of the next month, with their regular bill. Miller, the defendant, made an affidavit for a continuance in which he testified that the purpose of that trip that morning was to go fishing; that one Morgan was to have been the fourth man, but disappointed them, and they took Woodward aboard at Sheffield; that they purchased fishing tackle on Fifteenth street, but there is evidence that they were not closer than four miles to any creek, and the liveryman, Mr. Lowe, discovered no poles or other fishing tackle in the trap left at his barn. The merchant from whom the alleged tackle was purchased was not called as a witness. The whole fishing story must have been discredited by the jury. When the relations of all four of these parties to the defendant in the Walton case is considered, that the press had published the exposure of the day before, that it had been discussed in Messrs. Crane & Oldham's office that morning, and that Miller was an employee of the company, and in that office that morning, and that the alleged briber was one of this party on that drive to Blue Springs and that the only ostensible and credible purpose of that trip was to enable Woodward to board a train going east without taking passage at one of the stations in the city, and that Church knew all about the disclosures and defendant acted as paymaster for the party at Blue Springs and saw Woodward off, it can not be said that the jury did not have sufficient evidence that Woodward was the man who had attempted to bribe Dancy and was fleeing from arrest, and that defendant was aiding and assisting him in making his escape from arrest.

III. We are thus brought to the last contention of defendant and that is that the State did not show that defendant did not stand in the relation of husband or wife, parent or child, grandparent or grandchild, brother or sister, the persons excepted by our statute,

section 2365, Revised Statutes 1899, from guilt by reason of aiding and assisting an offender after the commission of a crime with intent to aid him in escaping or avoiding arrest.

Clearly Woodward and Miller, the defendant, neither bore the relation to each other of husband or wife; nor parent or grandparent, because it was shown that Woodward's father, Mr. Alexander Woodward, was still living and was a surety on his appeal bond; or child or grandchild, brother or sister; but it is argued that Woodward might have been related to Miller by marrying the sister of Miller, or by Miller marrying his sister, or Woodward might have been Miller's son-in-law by marrying his daughter. To this contention the State answers by offering and reading the sworn statement of defendant that he "Miller did not know who Woodward was when he rode with him in the trap from Sheffield to Blue Springs." In addition to that the jury had before them the difference in names of the two parties, and the fact testified to by Mr. Henshaw that Woodward was a man 30 to 35 years of age and Miller a man of 40 to 45 years of age. It is said it is not impossible for Woodward to have been related to Miller and the latter ignorant of that fact. But is the State required on a question of kinship to ascertain at its peril and disprove a relationship between the defendant and the criminal he had aided to escape which they themselves do not know, and which the defendant solemnly under oath denies? While it is true this exception of relations in certain degrees appears in the enacting clause of this statute and therefore it was necessary for the grand jury to negative such a relationship, yet it is also true that if such a relation existed it was an absolute defense whether Woodward was guilty or not and it is a reasonable presumption in the practical administration of justice that a man is acquainted with his own relatives or at least knows of his relationship to those within the degrees fixed by the statute, and when as in this case

the defendant was shown to have sworn he did not know who Grant Woodward was, it would have been a work of supererogation for the State to have gone further in proving the negative. It is true the defendant did not have to prove his innocence, but if there was any such relationship as would have excused him in aiding Woodward to make his escape it was peculiarly within his own knowledge and he has not availed himself of it.

In Rex v. Baxter, 2 East P. C. 781, 2 Leach Crown Law 660, a motion in arrest was based on the failure of the indictment to negative that the persons who had stolen the goods had not been convicted (being the exception in the statute 22 Geo. 3, ch. 58). Mr. Justice BULLER delivered the opinion of the ten judges, and held that the motion was not well taken and said, "If it were necessary, it would be merely stating a *negative averment which need not be proved by the prosecutor*. Such a fact is *matter of evidence* to be proved by the defendant, and which, when proved by him, would entitle him to an acquittal. This opinion is warranted by the case of Rex v. Pollard, 2 Ld. Raymond 1370. That was an indictment on the statute, 5 Anne, ch. 31, secs. 5 and 6, and the objection was, that the prosecutor had not averred that the principal could be taken; but the court held that that averment was not necessary; and the principle of it is to be found in an older authority (1 Sid. 303), and also in 2 Hawk. P. C., bk. 2, ch. 25, s. 112, where it is stated, that if there be any description *in the negative,* the affirmative of which would be an excuse for the defendant, *the proof of it lies on him.*"

This court, in State v. Lipscomb, 52 Mo. 32, said: "When the subject-matter of the negative averment lies peculiarly within the knowledge of the other party, the averment is taken as true, unless disproved by that party. Such is the case in civil or criminal prosecutions for a penalty for doing an act which the statutes do not permit to be done by any persons except those who are duly licensed therefor; as for selling liquors, exer-

cising a trade or profession and the like.    Hence, the
party, if licensed, can show it without the least incon-
venience.    [1 Greenleaf's Ev., 79, and cases cited;
Austin v. State, 10 Mo. l. c. 595; Blackman v. Com., 124
Pa. St. 578.]

So here, the statute is itself a license to those related
within the degrees mentioned to aid and assist their
relatives charged with felony and they show it by show-
ing the relationship.    While we think the grand jury
was required to negative the relationship of Woodward
and defendant, we hold that the knowledge of such a
relationship as would under the statute excuse defendant
for aiding and assisting Woodward escaping arrest, was
within the peculiar knowledge of defendant and could
have been established without any inconvenience, and
upon the authority of our own decisions, as well as those
quoted from the common-law authorities, the burden
was on him to show the relationship which would itself
have entitled him to an acquittal.    The judgment is
affirmed.

All concur.