[Crim. No. 3270. In Bank.—March 26, 1930.]

THE PEOPLE, Respondent, v. K. OSAKI et al., Appellants.

Brobeck, Phleger & Harrison and Lloyd E. Hewitt for Appellants.

U. S. Webb, Attorney-General, and Frank English, W. Augustine and J. Charles Jones, Deputies Attorney-General, for Respondent.

SEAWELL, J.—The defendants were jointly convicted upon five separate counts of an indictment containing six counts filed in the Superior Court of the county of Sutter, charging them with crime of conspiring to violate the Alien Land Act of the state. (Stats. 1921, p. lxxxiii; Stats. 1923, p. 1020; Stats. 1927, pp. 880, 881.)

The indictment charged that K. Yoshioka, a native of the Hawaiian Islands, but admittedly of Japanese lineage, and K. Osaki, an alleged alien not eligible to citizenship under the laws of the United States, conspired together with the object and to the end that said ineligible alien, Osaki, should have an interest in and a beneficial use of the parcels of land described in said several counts and should possess, enjoy, use, cultivate and occupy said real property in a manner and to an extent and for purposes otherwise than prescribed

by any treaty existing between the government of the United States and the nation of which said alien was a citizen or subject, and pursuant to said conspiracy said alien, Osaki, did acquire, possess, enjoy, use, cultivate and occupy said described real property in a manner and for purposes otherwise than prescribed by any treaty existing between the United States of America and the nation and country of which said alien, K. Osaki, was a citizen and subject. The fifth count of said indictment was dismissed. The lands described in the several counts of the indictment are agricultural lands and were possessed and occupied by defendants for agricultural uses.

The constitutionality of the amendment of the Alien Land Act approved May 16, 1927 (Stats. 1927, p. 880), and section 1983 of the Code of Civil Procedure, added in 1927 (Stats. 1927, p. 434), are challenged by the appellants upon several grounds, mainly that the alienage of Osaki, being an essential element of the offense charged—a part of the *corpus delicti*—his ineligibility must be proved by the prosecution and that burden cannot be shifted to the defendant by force of a mere negative allegation of the indictment to the effect that the defendant is an ineligible alien and an attempt to do so must fail as being in conflict with the due process clauses of section 13, article I, of the state Constitution and the Fourteenth Amendment to the federal Constitution.

Said amendments of the Alien Land Act and code section brought into question by appellants provide:

"Section 1. A new section to be known as section 9a is hereby added to the act cited in the title hereof and to read as follows:

"Section 9a. In an action or proceeding, civil or criminal, by the State of California, or the people thereof, under any of the provisions of this act, when the proof introduced by the state, or the people thereof, establishes the acquisition, possession, enjoyment, use, cultivation, occupation, or transferring of real property or any interest therein, or the having in whole or in part the beneficial use thereof by any defendant, or any of such facts, and the complaint, indictment or information alleges the alienage and ineligibility to United States citizenship of such defendant, the burden of

proving citizenship or eligibility to citizenship shall thereupon devolve upon such defendant.

"Section 2. A new section, to be known as section 9b,. is hereby added to said act and to read as follows:

"Section 9b. In any action or proceeding, civil or criminal, by the State of California, or the people thereof, under any of the provisions of this act, when the complaint, indictment or information alleges the alienage and ineligibility to United States citizenship of any defendant, proof by the state, or the people thereof, of the acquisition, possession, enjoyment, use, cultivation, occupation or transferring of real property or any interest therein, or the having in whole or in part of the beneficial use thereof by such defendant, or of any such facts, and in addition proof that such defendant is a member of a race ineligible to citizenship under the naturalization laws of the United States, shall create a *prima facie* presumption of the ineligibility to citizenship of such defendant, and the burden of proving citizenship or eligibility to citizenship as a defense to any such action or proceeding shall thereupon devolve upon such defendant.

"The Legislature hereby declares that its purpose in adopting this section is not to modify, limit or affect in any manner the provisions of section 9a of this act." (Stats. 1927, p. 880.)

Section 1983 of the Code of Civil Procedure is as follows:

"Whenever in any action or proceeding, civil or criminal, brought by, or in the name of the state or the people thereof, or by or in the name of any political subdivision or agency of the state, or by any public board or officer on behalf of any thereof, to enforce any law which denies any right, privilege or license to any person not a citizen of the United States, or not eligible to become such citizen, or to a person not a citizen or resident of this state, and whenever in any action or proceeding in which the state or any political subdivision or agency thereof, or any public board or officer acting on behalf thereof, is or becomes a party, it is alleged in the pleading therein filed on behalf of the state, the people thereof, political subdivision or agency, or of such board or officer, that such right, privilege or license has been exercised by a person not a citizen of the United States,

or not eligible to become such citizen, or by a person not a citizen or resident of this state, as the case may be, the burden shall be upon the party for or on whose behalf such pleading was filed to establish the fact that such right, privilege or license was exercised by the person alleged to have exercised the same, and upon such fact being so established the burden shall be upon such person, or upon any person, firm or corporation claiming under or through the exercise of such right, privilege or license to establish the fact that the person alleged to have exercised such right, privilege or license was, at the time of so exercising the same, a citizen of the United States, or eligible to become such citizen, or was a citizen or resident of this state, as the case may require, and was at said time legally entitled to exercise such right, privilege or license.'' (Stats. 1927, p. 434.)

The proofs made at the trial fully sustain the implied finding of the jury that the defendant Osaki, in common with his co-defendant Yoshioka, had an interest in and enjoyed a beneficial use of said described parcels of land and occupied the same in a manner and to an extent and for purposes otherwise than prescribed by any treaty existing between this country and the Empire of Japan.

No evidence was offered by either side pointedly directed to the citizenship of said alleged alien. If the Alien Land Acts, which cast upon said alleged alien the burden of proving his citizenship or eligibility to citizenship under the naturalization laws of this country as a prerequisite to the enjoyment of the rights which the evidence shows he undoubtedly exercised, are not in conflict with the due process provisions of the state and federal Constitutions, the judgments of conviction must stand.

Said Osaki gave testimony in his own behalf with the assistance of an interpreter of the Japanese language, but gave no evidence as to the country of his nativity. His associates were persons of the Japanese race. His racial appearance and characteristics were before the jury and trial judge. That he was a member of the Japanese race appears to have been conceded from the following questions propounded to witnesses on cross-examination by his counsel and the answers received thereto without objection or comment:

"Q. You knew, of course, he [Osaki] was a Japanese when you did so [rented cabins for housing purposes]? A. Yes, I knew he was a Japanese. . . .

"Q. So far as Japanese were concerned, which ones did you meet there at that time? A. Osaki. . . .

"Q. Is Osaki the only Japanese you saw there at that time? A. No, I saw a number of Japanese there, but he was the only one I talked to. . . .

"Q. Did you see any other Japanese except Osaki there at that time? A. No. . . .

"Q. Did you leave the lease or a copy of it with Osaki? A. Yes. . . .

"Q. Were you to see him again? A. Yes, we made an appointment with Osaki."

The statutes before us test the extent to which a state may go in safeguarding itself against evasions of its policies enacted into laws to promote the safety, peace and good order of its people. ■ That such powers, known as powers of police, were reserved to each state at the time of the adoption of the federal Constitution and that "in the exercise of such powers the state has wide discretion in determining its own public policy and what measures are necessary for its own protection and properly to promote the safety, peace and good order of its people" (*Terrace* v. *Thompson*, 263 U. S. 197, 217 [68 L. Ed. 255, 44 Sup. Ct. Rep. 15, 18]; *Porterfield* v. *Webb*, 195 Cal. 71 [231 Pac. 554]), is definitely put at rest by the decisions of the highest courts of our land. By the common law an alien could not acquire real property by operation of law, as by descent, but he could take by purchase. Story, J., in *Fairfax's Devisee* v. *Hunter's Lessee*, 7 Cranch (U. S.), 603, 608, 619, 620 [3 L. Ed. 453, see, also, Rose's U. S. Notes], said: "In the language of the ancient law, the alien has the capacity to take, but not to hold lands, and they may be seized into the hands of the sovereign."

■ The treaty between the United States and Japan is "a treaty of commerce and navigation" and was entered into for the purpose of establishing the rules to govern commercial intercourse between the countries, and it gives no rights to the subjects of Japan to own or lease lands for agricultural purposes. (*Terrace* v. *Thompson, supra.*) That the alien land acts which the legislature attempted to

strengthen and render more effective by the amendatory statutes under attack are of transcendent importance to the safety and peace of the state and nation, is thus forcibly stated in *Terrace* v. *Thompson, supra:* "The quality and allegiance of those who own, occupy and use the farm lands within its borders are matters of highest importance and affect the safety and power of the state itself."

We have emphasized the importance of the object sought to be accomplished by said amendments as bearing favorable comparison with a long list of regulatory and prohibitive acts which affect internal welfare, but which do not, as do the amendments before us, so directly affect national safety, and are, therefore, of less importance, so far as immediately and vitally affecting the safety of the state is concerned, to which judicial approval was given—even in the absence of authorizing statutes—to the application of the general rule that when the negative of an issue does not permit direct proof or where the facts come more immediately within the knowledge of the defendant, the *onus probandi* rests upon him. ■ Our own courts are among the long list of courts which have given their sanction to the rule in appropriate cases. While the subjects to which the rule has been applied are numerous, only the following will be mentioned: The regulation of the practice of medicine, dentistry and optometry; acts affecting public morals and the marital status, as bigamy, abortion; the right to take fish and game; violation of an act interdicting commercial intercourse between this country and Great Britain, its colonies and dependencies, and providing against the importation of British goods into this country except when brought in by neutral vessels; the rule as to the burden of proof being placed upon the defendant when the issue of insanity in criminal cases is offered as an excuse for the commission of crime; section 190 of the Penal Code, providing that the death penalty shall not be imposed upon any person for murder committed before such person shall have reached the age of eighteen years and providing further that the burden of proof as to the age of said person shall be upon the defendant. To this list may be added numerous regulatory acts and ordinances making it an offense to exercise certain acts or engage in certain businesses or callings without first having obtained a license

or franchise to do so. In practically all of such cases where the negative of an issue does not permit direct proof or where the facts come more immediately within the knowledge of the defendant, the general rule that the *onus probandi* rests upon him has been applied. Nor is this rule an innovation or a creation of modernists. It was recognized at common law and applied by the very able American and English jurists beginning with an early period in the history of both. In the earlier treatises and decisions the necessity of negativing an exception in an indictment depended upon the distinction between a proviso, not referred to in the enacting clause of the statute, and a reference in that clause to exceptions subsequently enumerated.

In *Fleming* v. *People,* 27 N. Y. 329, the indictment contained none of the statutory exceptions which rendered a subsequent marriage valid. The eminent Chief Justice Denio, in 1863, in a separate opinion, expressed the view that the indictment, which failed to negative the exceptions, was formally defective in a technical sense, but, within the meaning of the Revised Statutes, which, in terms are strikingly similar to our article VI, section 4½, state Constitution, and provided "that no indictment shall be deemed invalid, nor shall any trial, judgment, or other proceeding thereon, be affected by reason of any defect or imperfection in matters of form, other than those which are enumerated, which shall not tend to the prejudice of the defendant," the defect was not a substantial defect and cited several New York cases in support of his view. To show more fully the formal character of the defect, the jurist continues: " . . . it will be material to state that the prosecution was under no necessity of giving evidence to show that the case was not within any of the exceptions. That was a matter of defense, to be made out by the prisoner, if he was able to do it. Mr. Archbold's treatise, already referred to, which without doubt conforms to the existing practice on criminal trials in England, lays down what evidence it is necessary for the prosecution to produce upon indictments for bigamy, and what the defendant may show in his defense. . . . (Archbold, 595.) It is, moreover, a *general* rule of evidence, that where the negative of an issue does not permit direct proof, or where the facts come more immediately within the knowledge of the defendant, the *onus probandi*

rests upon him. The cases upon this principle are referred to in Cowen and Hill's Notes (p. 490, note 383, ed. of 1843). Among the cases are the familiar ones of a physician practicing without a license, and the selling of spirituous liquors without license. The prosecution need not prove the want of qualification. The circumstances referred to in the 9th section of the bigamy act are *highly exceptional* and of *rare occurrence,* and rest peculiarly in the knowledge of the defendant.'' (Italics supplied.) The concluding portions of the opinion are to the effect that upon proof of successive marriages of the defendant and that the first husband or wife was living when the second marriage took place, the case of the prosecution is *prima facie* made out, and it then lies with the defendant to show that he is protected by one or the other of the exceptions and that the defendant was misled by allegations of an indictment which plainly stated all that the prosecution was bound to prove, though it did not negative the existence of circumstances which the defendant was at liberty to bring forward in his defense.

The main opinion holds that the clause contained in the section defining the offense of bigamy is rather in the nature of a proviso than an exception. Continuing, it is said: ''The statute does not make the condition or the character of either party to the first or second marriage a part of the offense. It makes every second marriage, during the life of the first or second wife, a crime, but provides that the statute shall not apply to certain cases enumerated in another section, and which are cases of desertion, etc. The averment and the proof to justify a second marriage in any such case are to come from the defendant. Hawkins' Criminal Law (b. 2, chap. 25, sec. 113) gives the rule that there is no need to allege, in an indictment, that the defendant is not within the benefit of the provisos of a statute, whereon it is founded, and this even as to those statutes which in their purview expressly take notice of the provisos, as by saying none shall do the thing prohibited, otherwise than in such special cases, etc., as are expressed in the act. So Chitty's Criminal Law (p. 283) says it is not necessary to allege that the defendant is not within the benefit of the provisos of the statute, though the purview should expressly notice them, as by saying that none shall do

the act prohibited, except in the cases thereinafter excepted.''
Citing a case in which the indictment was laid upon a statute
(2 Eliz.) containing an exception the judges there resolved
that the better course was to omit the exception in the
indictment ''notwithstanding it be comprised in the body
of the act in the same manner as if it had been only in a
proviso; in which case it is for the prisoner to help himself,
as in cases of such proviso, if he can do it; for the words
'other than,' etc., are but as referring to the provision sub-
sequent to the statute, in which case this matter shall be
used but as a proviso itself shall be; . . . ''

The act of March 1, 1809, chapter 91, section 2 (2 Story's
Laws, 1114), prohibited all importation of goods from British
ports into the United States. The act of 1814 (3 Stat. 123)
excepted importations from British ports in neutral vessels.
In a prosecution for an importation of goods in a vessel
not neutral (*United States* v. *Hayward*, 26 Fed. Cas. 240
(No. 15,336), the question arose as to the necessity of
negativing in the information the neutrality of the vessel
in which the goods were brought into the United States.
Justice Story in deciding the point said:

''The first objection depends upon the solution of the
point, upon whom the burden of proof rested, as to the
neutrality of the vessel, in which the goods were imported.
It is very doubtful, whether it was necessary, in the count,
to allege that the goods were imported in a vessel not neu-
tral; for the general rule of law is, that it is sufficient to
negative the exceptions in the enacting clause of a statute,
and exceptions, which come in by way of proviso, or in
subsequent statutes, are properly matter of defense for the
defendant. [Citation of cases omitted.] The present case
seems to fall within the rule, and is not easily, if at all,
distinguishable. But it is not necessary to decide this point,
because the count does, in fact, negative the vessel's be-
ing neutral. . . .

''From the evidence in the case it does not appear, that
the plaintiffs knew in what vessel the importation was made,
but this was a fact peculiarly within the knowledge of the
defendant. Besides, the fact of importation being proved,
from a British port into the port of Orrington (which must
be taken as a necessary preliminary, so far as respects this
part of the charge of the court), the case fell within the

general words of the act of 1809, and the exception, that they were imported in a neutral ship, was properly matter of defense. The law did not presume that the vessel was neutral in favor of the defendant. The charge was not against the defendant personally of a criminal neglect of duty, but against the goods only, of a positive act, to-wit, an illegal importation. And to call upon the plaintiffs to prove that the vessel was not neutral, was to require the proof of a negative allegation, which the plaintiffs had no means in their power to prove, and proofs of the contrary of which, if they existed, were within the reach of the defendant. I cannot distinguish the present case in principle from those, which have been decided on the game laws. There, the declaration must allege that the defendant is not duly qualified, negativing specifically all the exceptions of the statute; and yet it seems admitted, that if the act of killing game be proved, the burden of proof of his being within the exceptions of the statute is thrown on the defendant. It is perhaps not easy to reconcile with these decisions some of the general doctrines stated in some of the authorities. Such, for instance, as the doctrine, that wherever the charge involves criminality, the law will not easily suppose it; and, therefore, if the charge contains a negative, the law will presume the affirmative without proof. If this were universally true, then, under the game laws, the proof of not being qualified ought to be shown by the plaintiff, for the charge is clearly of a criminal nature. Without pretending to reconcile all the *dicta* in the books, it seems to me, that in respect to negative allegations, the reasonable rule is, that the burden of proof shall rest on the party, who holds the affirmative; and especially where the facts are peculiarly within his privity and cognizance; and that this rule applies more strongly, where the party seeks to shelter himself under an exception, which was not incorporated into the original prohibition of the statute creating the offense. See *Attorney-General* v. *Sheriff*, Forrest, 43. An exception may, perhaps, properly hold, where the charge substantially consists in a criminal neglect or omission of duty. It seems to me, therefore, that the burthen of proof, in the case at bar, that the vessel in which the goods were imported was neutral, lay on the

claimant and not on the United States, and that in this respect the charge of the learned judge was erroneous. . . .

"It is very doubtful," the eminent justice continues, "whether it was necessary, in the count, to allege that the goods were imported in a vessel not neutral; for the general rule of law is, that it is sufficient to negative the exceptions in the enacting clause of a statute, and exceptions, which come in by way of proviso, or in *subsequent* statutes, are properly matters of defense for the defendant." (Italics supplied.)

Section 1 of the Alien Land Act provides:

"All aliens eligible to citizenship under the laws of the United States, may acquire, possess, enjoy . . . real property or any interest therein in this state, in the manner and to the same extent as citizens of the United States, except as otherwise provided by the laws of this state."

Section 2 provides:

"All aliens other than those mentioned in section 1 of this act may acquire, possess, enjoy and transfer real property . . . in the manner and to the extent and for the purposes prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject, and not otherwise."

By the foregoing section all aliens eligible to citizenship may acquire real property on equal terms with citizens, except as otherwise provided by the laws of the state. By section 2 persons not eligible to citizenship are limited in this respect to such rights as are conferred by treaty. A re-arrangement of language would not alter the sense or purpose of the act. The disturbing question of whether the exception is in the enacting clause or in a subsequent clause or subsequent section of the clause led to such re-finement as to justly provoke the observation made in *State* v. *Abbey,* 29 Vt. 60 [67 Am. Dec. 754], that "there seem to be many shadowy distinctions, the sound reason and good sense of which are not easily discoverable." *State* v. *Abbey* was a prosecution for bigamy. It is true that the court held that the exceptions contained in the penal act were such as need not be negatived, but it also recognizes the rule of convenience in the following significant language: "The difficulty and impracticability arising from a different construction of the act is itself a good reason why it should

not be adopted; particularly as all the matters embraced in those exceptions are peculiarly within the knowledge of the respondent.'' An examination of the authorities will show that the reason stated in the above quotation is practically the reason that rules all the cases where the question of negative allegations is present.

Discussing the subject of negative allegations, Justice Story (*United States* v. *Hayward, supra*) observed: ''It is very doubtful whether it was necessary in the count, to allege that the goods were imported in a vessel not neutral; for the general rule of law is, that it is sufficient to negative the exceptions in the enacting clause of a statute, and exceptions which come in by way of proviso, or in *subsequent statutes*, are properly matters of defense for the defendant.'' (Italics supplied.)

In the instant case subsequent statutes by express language place upon the defendant—who, in the instant case, if not conceded to be a member of an ineligible race is proved to be such—the burden of showing that he is a citizen of this country by birth. The intent and effect of this subsequent legislation is too obvious to admit of doubt. The judicial rule which the People would apply to the instant case and which has become a statute of this state, had its origin in the early period of our judicial history. It received the express sanction of this court in *People* v. *Boo Doo Hong*, 122 Cal. 607 [55 Pac. 402, 403]. The prosecution therein was conducted under the State Medical Act, the defendant being charged with the crime of practicing medicine without first having procured a certificate to so practice. No evidence was introduced on either side tending to show that the defendant had or had not a certificate to so practice. The court instructed the jury that the burden was upon the defendant to establish that he had a certificate to so practice medicine as provided by law, and if he failed to prove that he had such a certificate, then it must be taken as true that he had not procured a certificate. The judgment of conviction was approved, the court adopting as the basis of its decision a paragraph taken from Greenleaf on Evidence. We quote the court's foreword as well as said paragraph:

''Mr. Greenleaf, in his work on Evidence, volume 1, section 79, under the heading 'Negative Allegations,' says:

'But when the subject matter of a negative averment lies peculiarly within the knowledge of the other party, the averment is taken as true unless disproved by that party. Such is the case in civil or criminal prosecutions for a penalty for doing an act which the statutes do not permit to be done by any persons, except those who are duly licensed therefor; as, for selling liquors, exercising a trade or profession, and the like. Here the party, if licensed, can immediately show it without the least inconvenience; whereas, if proof of the negative were required, the inconvenience would be very great.' (Citing a large number of cases. See, also, 3 Rice on Evidence, sec. 260, where the same rule is declared.)''

*People* v. *Fortch,* 13 Cal. App. 770 [110 Pac. 823], a dental case, and *People* v. *T. Wah Hing,* 47 Cal. App. 327 [190 Pac. 662], *People* v. *Goscinsky,* 52 Cal. App. 62 [198 Pac. 40], and *People* v. *Saunders,* 61 Cal. App. 341 [215 Pac. 120], medical cases, followed by direct reference *People* v. *Boo Doo Hong, supra.* Many additional cases covering the same and other subjects, notably the regulation and prohibition of the manufacture, sale and transportation of intoxicating liquors, could be cited in large numbers which follow the rule approved by Justice Story to the effect "that in respect to negative allegations, the reasonable rule is, that the burden of proof shall rest on the party who holds the affirmative; and especially where the facts are peculiarly within his privity and cognizance," etc.

The reasons for applying the principle approved in the medical, dental, optometry, intoxicating liquor and certain other concrete cases, obviously do not rest upon firmer grounds of public necessity, urgency or convenience than do those which support the application of the rule in cases in which the question of eligibility to citizenship and the right of ownership of the soil is directly involved. The enactment and enforcement of laws which have to do with public morals and police regulations are powers which primarily inhere in citizenship. Unless the evidence as to the right to exercise the prerogatives of a citizen comes from the defendant who indisputably is in possession of the facts which may be furnished by him without causing him any great inconvenience, a search with uncertain results must be made by the state of a multitude of records ex-

tending to the four corners of the United States and its possessions and into foreign lands, while the right to practice medicine may be readily determined by an inspection of a register to be found in the custody of a single officer. We doubt not that the same courts which gave being to the rule would have unhesitatingly applied it to the facts of the instant case, as illustrative of the principle announced, had such a case arisen. The views expressed by Justice Story in *United States* v. *Hayward, supra,* which are included in our quotation from that case, preclude any other conclusion.

The common-law rule, which has come to be known as the "rule of convenience," has been recognized and applied by our federal and state courts in large numbers in the absence of a statute to that effect. We will not attempt to list the numerous cases. The state of Missouri adopted an act making it an offense for any person not standing in the relation of husband and wife, parent or child, grandparent or grandchild, brother or sister, to aid and assist another to escape arrest. One Miller was indicted and convicted of having aided and assisted Grant Woodward in escaping arrest. The indictment negatived the existence of relationship, but the state did not offer evidence to show that the defendant was not within the degree of relationship to the person assisted, which constituted the exceptions. In treating the subject the Supreme Court of Missouri in *State* v. *Miller,* 182 Mo. 370 [81 S. W. 867, 873], restates the rule which has received the approval of a great majority of the courts of the Union, Professor Wigmore and other text-writers. It is there said:

"While it is true this exception of relations in certain degrees appears in the enacting clause of this statute, and therefore it was necessary for the grand jury to negative such a relationship, yet it is also true that, if such a relation existed, it was an absolute defense whether Woodward was guilty or not, and it is a reasonable presumption in the practical administration of justice that a man is acquainted with his own relatives, or at least knows of his relationship to those within the degrees fixed by the statute, and when, as in this case, the defendant was shown to have sworn he did not know who Grant Woodward was, it would have been a work of supererogation for the state to have gone

further in proving the negative. It is true the defendant did not have to prove his innocence; but, if there was any such relationship as would have excused him in aiding Woodward to make his escape, it was peculiarly within his own knowledge, and he has not availed himself of it. . . .

"While we think the grand jury was required to negative the relationship of Woodward and defendant, we hold that the knowledge of such a relationship as would, under the statute, excuse defendant for aiding and assisting Woodward escaping arrest, was within the peculiar knowledge of defendant, and could have been established without any inconvenience and upon the authority of our own decisions, as well as those quoted from the common-law authorities, the burden was on him to show the relationship, which would itself have entitled him to an acquittal."

In *State* v. *Evans*, 50 N. C. 250, a liquor case, the judgment was reversed on the ground that the evidence was as fully within the knowledge of an accessible third person as it was within the knowledge of the defendant and on that ground a reversal was entered. The decision recognizes the rule of necessity as founded alike on reason and authority. In that case, under the facts above referred to, the court said: "We think it best to adhere to the general rule until the legislature may think proper to alter it." Here, also, is a recognition by the court of the power of the legislature to adopt a statute such as we have before us.

Many cases may be found in the books in which the rule of convenience or necessity was applied even where there seemed to be no rational connection between the fact proved and the fact presumed. In other cases the presumption doctrine and the rule of necessity or convenience are both applied with approval. *Casey* v. *United States*, 276 U. S. 413 [72 L. Ed. 632, 48 Sup. Ct. Rep. 373, 374], is a typical case. Casey was convicted upon an indictment charging him with the purchase of a certain quantity of morphine not in or from the original stamped package. No testimony was introduced directly concerning the purchase and the government relied in part at least upon the presumption of a violation of the act which the statute purported to create. Mr. Justice Holmes delivered the opinion of the court and Mr. Justice Butler placed a dissent on a ground which is also urged here, that the *corpus delicti*

had not been proved. Mr. Justice Holmes, discussing presumptions and the rule of convenience or necessity, said:

"With regard to the presumption of the purchase of a thing manifestly not produced by the possessor, there is a 'rational connection between the fact proved and the ultimate facts presumed.' (*Luria* v. *United States*, 231 U. S. 9, 25 [58 L. Ed. 101, 34 Sup. Ct. Rep. 10]; *Yee Hem* v. *United States*, 268 U. S. 178, 183 [69 L. Ed. 904, 45 Sup. Ct. Rep. 470].) Furthermore, there are presumptions that are not evidence in a proper sense but simply regulations of the burden of proof. (*Greer* v. *United States*, 245 U. S. 559 [62 L. Ed. 469, 38 Sup. Ct. Rep. 209, see, also, Rose's U. S. Notes].) The statute here talks of *prima facie* evidence but it means only that the burden shall be upon the party found in possession to explain and justify it when accused of the crime that the statute creates. (4 Wigmore, Evidence, sec. 2494.) It is consistent with all the constitutional protections of accused men to throw on them the burden of proving facts peculiarly within their knowledge and hidden from discovery by the government. (4 Wigmore, Evidence, sec. 2486.) In dealing with a poison not commonly used except upon a doctor's prescription easily proved, or for a debauch only possible by a breach of law, it seems reasonable to call on a person possessing it in a form that warrants suspicion to show that he obtained it in a mode permitted by the law. The petitioner cannot complain of the statute except as it affects him."

The case of *Yee Hem* v. *United States*, 268 U. S. 178 [69 L. Ed. 904, 45 Sup. Ct. Rep. 470, 471], is an instructive case as to questions of the power of the state to create presumptions and acts which it is argued contravene the due process of law clauses of the federal and state Constitutions. We quote somewhat fully from that decision for the reason that it has a bearing upon a number of questions raised by appellants, including the objection that the law compels an accused person to be a witness against himself. Yee Hem was convicted of concealing a quantity of smoking opium after importation, with knowledge that it had been imported in violation of an act of Congress prohibiting its importation except for certain designated purposes only. It further provided that whenever the defendant on trial is shown to have or to have had, possession of such

opium, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant shall explain the possession to the satisfaction of the jury. It was also provided that all opium prepared for smoking found within the United States shall be presumed to have been unlawfully imported and the burden of proof shall be on the accused to rebut such presumption. Possession and concealment were proved and the lower court instructed the jury in accordance with the language of the statute. The court, speaking through Mr. Justice Sutherland, said:

"The authority of Congress to prohibit the importation of opium in any form and, as a measure reasonably calculated to aid in the enforcement of the prohibition, to make its concealment with knowledge of its unlawful importation a criminal offense, is not open to doubt. . . . "

"In *Mobile etc. R. R.* v. *Turnipseed,* 219 U. S. 35, 42, 43 [Ann. Cas. 1912A, 463, 32 L. R. A. (N. S.) 226, 55 L. Ed. 78, 31 Sup. Ct. Rep. 136, 137, 138, see, also, Rose's U. S. Notes], this court, speaking through Mr. Justice Lurton, said:

" 'The law of evidence is full of presumptions either of fact or law. The former are, of course, disputable, and the strength of any inference of one fact from proof of another depends upon the generality of the experience upon which it is founded. . . .

" 'Legislation providing that proof of one fact shall constitute *prima facie* evidence of the main fact in issue is but to enact a rule of evidence, and quite within the general power of government. Statutes, national and state, dealing with such methods of proof in both civil and criminal cases abound, and the decisions upholding them are numerous. . . . '

"Every accused person, of course, enters upon his trial clothed with the presumption of innocence. But that presumption may be overcome, not only by direct proof, but, in many cases, when the facts standing alone are not enough, by the additional weight of a countervailing legislative presumption. If the effect of the legislative act is to give to the facts from which the presumption is drawn an artificial value to some extent, it is no more than happens in respect of a great variety of presumptions not resting upon statute. (See *Dunlop* v. *United States,* 165 U. S. 486, 502

503 [41 L. Ed. 799, 17 Sup. Ct. Rep. 375]; *Wilson* v. *United States,* 162 U. S. 613, 619 [40 L. Ed. 1090, 16 Sup. Ct. Rep. 895, see, also, Rose's U. S. Notes].) In the Wilson case the accused, charged with murder, was found, soon after the homicide, in possession of property that had belonged to the dead man. This court upheld a charge of the trial court to the effect that such possession required the accused to account for it, to show that as far as he was concerned the possession was innocent and honest, and that if not so accounted for it became 'the foundation for a presumption of guilt against the defendant.'

"The point that the practical effect of the statute creating the presumption is to compel the accused person to be a witness against himself may be put aside with slight discussion. The statute compels nothing. It does no more than to make possession of the prohibited article *prima facie* evidence of guilt. It leaves the accused entirely free to testify or not as he chooses. If the accused happens to be the only repository of the facts necessary to negative the presumption arising from his possession, that is a misfortune which the statute under review does not create but which is inherent in the case. The same situation might present itself if there were no statutory presumption and a *prima facie* case of concealment with knowledge of unlawful importation were made by the evidence. The necessity of an explanation by the accused would be quite as compelling in that case as in this; but the constraint upon him to give testimony would arise there, as it arises here, simply from the force of circumstances and not from any form of compulsion forbidden by the Constitution."

In practically every criminal prosecution the defendant is required from necessity to rebut the effect of the evidence offered against him and frequently, where there is no other rebutting witness but himself, to an incriminating fact or circumstance, the necessity of the situation compels him to take the witness chair.

It would serve no purpose to cite an accumulation of authorities as to the general rule that the burden of proof lies on the person who wishes to support his cause by a particular fact which lies more peculiarly within his knowledge or as to the broad power which inheres in legislative bodies to create by statute presumptions, as observed *supra,*

by Mr. Justice Sutherland, in aid of the enforcement of important state policies.

With the foregoing decisions and treatises furnishing the background of the legislation here challenged as being in violation of the due process clause of the organic law of the state and nation, we proceed to a consideration of the decisions of this state upon which appellants rely for a reversal. The principal case is *People* v. *Quarez*, 196 Cal. 404 [238 Pac. 363, 366]. The statute under which that case (Stats. 1923, chap. 339, p. 695) was decided provided that no unnaturalized foreign-born person and no person who had suffered a prior conviction of a felony against the person or property of another or against the federal government or state government shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person. The firearms capable of being concealed include such as have a barrel less than twelve inches in length. The penalty prescribed for a violation of the act is imprisonment in the state prison for not less than one nor more than five years.

The Quarez case was decided in July, 1925, and the amendments here under consideration were adopted at the first session of the legislature convening thereafter. It is manifest that said amendments were adopted with the purpose of embodying in the law in concrete form an act providing that the burden is upon persons who are members of alien races ineligible to citizenship and who are exercising rights of a proprietary character with respect to real property, to make proof of their eligibility in cases where their dealings with real property are conducted in a covert manner or otherwise disclose circumstances sufficient to "warrant the suspicion" that their right of ownership or occupancy is not permitted by law. (*Casey* v. *United States, supra.*) The Quarez case was decided largely, if not entirely, upon the authority of *People* v. *Frey*, 165 Cal. 140 [131 Pac. 127, 129], a decision in which three of the justices, for reasons not revealed, took no part. The defendant in the case was convicted under section 476a of the Penal Code on a charge of drawing a check upon a bank in which he had no sufficient funds or credit to meet said check, all of which he well knew. There was no evidence in the case that the defendant had no funds

in or credit with the bank, except the confession of the defendant. The check was deposited by the payee in a local bank and forwarded to the bank on which the check was drawn. In due time it was returned with the words ''No account'' written across its face. No evidence was offered to show by whom the words ''No account'' were written. In the decision it was said:

''We are aware of the fact that many cases properly hold very slight proof of the *corpus delicti* to be sufficient basis for the admission of a defendant's confession, but we know of none which sustains proof of the *corpus delicti* upon purely hearsay testimony. *People* v. *Spencer*, 16 Cal. App. 759 [117 Pac. 1039], is cited with apparent confidence by the attorney-general, but that was a case in which the appellant contended that his want of credit with the bank was not sufficiently shown. The court held that such a fact might be proved by circumstantial as well as by direct evidence. . . . ''

The decision expressly states that the fact as to whether the defendant had funds in the bank was as clearly and fully within the knowledge of the bank officials as it was within the knowledge of the defendant. The name and location of the bank was definitely stated in the information and there was absolutely no theory upon which the rule of convenience could have been invoked. All that was said on that subject may be regarded as *obiter dicta.* It is not held even by way of *dicta* or otherwise that the rule is applicable *only* to prosecutions such as practicing some profession or following some calling without the license provided therefor by law. It is true that it is said that it is a special rule applicable to such cases ''*and the like*,'' but no fixed limitation is placed upon the application of the rule. The clause disposing of the cases reads: ''The ruling of the court in permitting proof of the confession before proof of the *corpus delicti* was error for which a reversal must be ordered.''

The rule of convenience was not intended to and it is not now contended that it should have been applied to the Frey case, for the obvious reason that the bank in which defendant represented he had money on deposit was as well within the knowledge of the prosecution as it was within the knowledge of the defendant, and the prosecution, having offered

no competent evidence tending to establish that fact, failed under all rules of law to prove its case, the confession alone having been held insufficient to prove the *corpus delicti.* The rule of convenience was neither a factor in that case, the Frey case, nor in the other cited case, *People* v. *Whiteman,* 114 Cal. 338 [46 Pac. 99]. The Quarez case, however, recognizes the rule in the following language: "It is *a well-settled rule of law* that where the negative of an issue does not permit of direct proof, or where the facts come more immediately within the knowledge of the defendant, the *onus probandi* rests upon him. This doctrine is illustrated in cases of practicing medicine without a license or of selling spirituous liquors without a license." (Italics supplied.) It does not recite the fact that the rule was applied years before a license was required to practice medicine. That medical cases are cited as apt *illustrations* of the rule by no means limits its application to such cases only, and no case so holds. The books, reports and law texts contain a multitude of cases which furnish their own refutation of the claim that the rule is not applicable to any other specific offenses. If the refusal to apply the rule in the instant case can be soundly based upon the theory that every part of a statutory offense must be affirmatively proved and the burden cannot under any circumstances be shifted to the defendant, by what process of reasoning can it be made to appear just or logical to apply it to medical and license cases, as to which the knowledge of the accused as to whether he is licensed to practice medicine is not more intimately and peculiarly within his knowledge than is the fact of citizenship within the knowledge of one who asserts prerogatives which are only accorded to citizens of the country?

The Quarez case quotes with seeming approval from 16 Corpus Juris, page 630:

"Where the subject matter of a negative averment in the indictment, or a fact relied upon by defendant as a justification or excuse, relates to him personally [as citizenship] or otherwise lies peculiarly within his knowledge, the *general* rule is that the burden of proof as to such averment or fact is on him." (Also citing 22 Cor. Jur., p. 81.) (Italics supplied.)

If every element of a statutory offense, both negative and affirmative, must be proved by the prosecution and the burden cannot, in any case, be placed upon the defendant, on the theory that every element descriptive of the offense is an essential part of the *corpus delicti*, and must be affirmatively proved, the rule created by courts in the first instance upon considerations of necessity and public policy and adopted by this state as a statute, will be completely nullified.

In the instant case the statute requires that the People prove all the facts which the law-making body determined were reasonably within the power of the People to prove, to wit, first, that the accused is a member of a race ineligible to citizenship, and second, that he has acquired real property, or an interest therein, both of which are provable, by facts, records and documents existent, within the limits of the locality and state in which the land is situate, while the place of birth may be anywhere upon the globe, known only to the accused. If in the practical and reasonable administration of the law any situation could exist which would justify the application of the rule *ab inconvenienti*, none could be more appropriate for its application than the determination of the question of foreign birth, a fact intimately and peculiarly within the knowledge of the person who by the exercise of certain rights has assumed to be native born. Conceding, as contended by appellants, that foreign nativity forms a part of the *corpus delicti*, the allegations of the indictment that the defendant was an alien not eligible to citizenship must be taken as true in the absence of proof to the contrary.

The rule of convenience was expressly held applicable to this class of cases in *People* v. *Velasquez,* 70 Cal. App. 362 [233 Pac. 359, 361], Mr. Justice Curtis, then a justice of the District Court of Appeal, Second District, Division One, writing the opinion of the court. One of the questions discussed was as to the method of proving whether or not the defendant, who was charged with the unlawful possession of a firearm capable of being concealed—the same offense charged in the Quarez case—had been naturalized by the courts of this country. The rule of convenience is thus treated:

"This rule is applied in the main to prosecutions of persons charged with the violation of statutes making it

illegal to engage in certain businesses or to follow certain professions without first obtaining a license so to do. In most, if not in all, of the cases of which we have any knowledge, the statute designates the particular board or officer from which such a license is to be obtained. The inconvenience in such a case of procuring evidence that the accused had no such license as required by the statute can hardly be compared with that cast upon the prosecution in an action like the present, if required to prove that the defendant had not been naturalized. In the former class of cases, it would only be necessary to examine the records of one board, or the books of one officer, to ascertain whether the required license had been issued, or not, and to have as a witness one person from the office of such a board, or officer, to prove the fact that no license had been issued to the accused. In an action like that before us, owing to the fact that the defendant might have been naturalized in any one of a large number of courts, it would be necessary to have as witnesses at the trial representatives or officers from all of said courts, and possibly the records themselves to show, if such were the fact, that the defendant had never been naturalized in any of said courts. Such a requirement would cast upon the prosecution an interminable amount of labor and the greatest of inconvenience. On the other hand, to require the defendant to show that he was naturalized, casts no unreasonable burden upon him. If he has had conferred upon him, by any court of competent jurisdiction, the privilege of citizenship, he either has his naturalization papers, or, if they have been lost, properly authenticated copies thereof might be procured with little trouble or expense from the court which granted the original. We are, therefore, of the opinion that this exception to the general rule, relative to the burden of proof, should apply to actions like the present, and that it was not obligatory on the part of the prosecution to prove that the defendant had not been naturalized. His naturalization, if such were the fact, was peculiarly within his own knowledge and could have been proven by him with but little inconvenience.''

All of the California cases cited by appellants were decided prior to any legislative enactment similar in purport to the amendments under consideration. This brings us

to the power of the legislature to enact sections 9a and 9b of the Alien Land Act and section 1983 of the Code of Civil Procedure. We need not repeat the language used by the United States Supreme Court in *Terrace* v. *Thompson, supra,* as to the broad powers vested in sovereignty in determining what measures are necessary for its own protection and properly promote the safety, peace and good order of its people in legislating upon this particular subject. (*Cockrill* v. *People,* 268 U. S. 258 [69 L. Ed. 944, 45 Sup. Ct. Rep. 490].) The general power of the legislature to create legal presumptions of evidence and also presumptions that are not evidence in a proper sense, but simply regulations of the burden of proof, are fully considered in *Casey* v. *United States* and cases cited therein. The law, as therein observed, is full of presumptions. Nor are we forced, in sustaining the legislation in the instant case, to go as far as courts may properly go, as was said in *Yee Hem* v. *United States, supra:*

"If the effect of the legislative act is to give to the facts from which the presumption is drawn an artificial value to some extent it is no more than happens in respect of a great variety of presumptions not resting upon statute." (Citing *Dunlop* v. *United States,* 165 U. S. 486 [41 L. Ed. 799, 17 Sup. Ct. Rep. 375; *Wilson* v. *United States,* 162 U. S. 613 [40 L. Ed. 1090, 16 Sup. Ct. Rep. 895, see, also, Rose's U. S. Notes].)

Appellants contend, and cite numerous cases as authority in support of their contention, that a rational connection between the fact proved and the ultimate fact presumed must exist. In most all of the cases cited to the point there is no semblance of rationality between the fact proved and the fact presumed. Appellants rely with seeming assurance upon two comparatively recent decisions of the United States Supreme Court, *Manley* v. *Georgia,* 279 U. S. 1 [73 L. Ed. 575, 49 Sup. Ct. Rep. 215, 217], and *Western & Atlantic Railroad* v. *Henderson,* 279 U. S. 639 [73 L. Ed. 884, 49 Sup. Ct. Rep. 445, 446]. The first of these cases was upon a statute of Georgia which provided that every insolvency of a bank should be deemed fraudulent and the president and directors should be punished by imprisonment and labor in the state penitentiary for not less than one or more than ten years, provided that the

defendant might repel the presumption of fraud by showing that the affairs of the bank had been fairly and legally administered. The indictment merely alleged that the appellant, being president of a certain bank, and he and two others being directors and the accused being by law charged with the fair and legal administration of the business and affairs of said bank, then and there pending, and during the official charge and responsibility of the accused said bank became fraudulently insolvent. The court, upon considering the facts to be presumed, held that they were vague and uncertain and the connection between the fact proved and that presumed was not sufficient, expressing itself as follows: ''Unforeseen demands in excess of the reserves required do not tend to show that the crime created by section 28 has been committed. The same may be said as to the other conditions defined as insolvency. The connection between the fact proved and that presumed is not sufficient.'' The rule of convenience was not discussed. The other case rested upon a Georgia statute, which provided: ''A railroad company shall be liable for any damages done to persons, stock, or other property by the running of the locomotives, or cars, or other machinery of such company, or for damage done by any person in the employment and service of such company, unless the company shall make it appear that their agents have exercised all ordinary and reasonable care and diligence, the presumption in all cases being against the company.''

In condemning the statute the court remarked that a statute creating a presumption that is arbitrary or that operates to deny a *fair opportunity to repel it* violates the due process clause of the Fourteenth Amendment. In this case no reference was made to the rule of convenience and obviously there was no room for its application for the reason that the facts were as accessible to appellees as they were to appellants.

Those cases and others cited by appellants in which the connection between the facts proved and the fact presumed is more arbitrary and irrational than disclosed by said cases, do not change the rule approved by numerous judicial pronouncements which have been and which may readily be cited.

In appraising the validity of the amendments and statute in suit, courts cannot put aside the historical controversies which preceded the adoption of the Alien Land Acts and the reasons which impelled their adoption. Neither can we put aside the various difficulties which the state has experienced in its attempt to enforce said acts. These difficulties arise in no small measure from the difficulty of identifying one member of the several ineligible alien races from another by reason of racial similitudes. They speak in Oriental languages which have no basic relation or resemblance to the English or Latin languages, and, because of their Oriental forms of worship and their lack of knowledge of and interest in our national and ancestral traditions and future objectives, they live in groups or communities having no social, civic or political intercourse with the citizens of the country or those eligible to become citizens, hedged in by impenetrable privacy and secrecy as to their status as citizens and affairs generally to a degree that nowhere else obtains.

In the instant case the evidence shows Osaki to be a member of an alien race ineligible to citizenship. His companions and associates in business were of that race. He was unable to speak the English language and testified with the assistance of an interpreter of the Japanese language. If alien born, he was ineligible to citizenship and if native born he was not entitled to exercise the right of franchise under the laws of the state. No alien shall be naturalized or admitted as a citizen of the United States who cannot speak the English language. (U. S. Code Ann., Aliens and Citizenship, title 8, sec. 365, p. 415 [8 U. S. C. A., sec. 365].) His physical appearance was before the court and a number of witnesses testified that he was a Japanese and to other facts which tended to show beyond doubt that he was of that race. In testifying he made no denial of this obvious fact, nor did he testify as to the place of his nativity, but contented himself with the denial of being the owner of or in any way interested in the real property described in the indictment, over which he exercised indisputable rights of a proprietor. One of the difficulties, as this case well illustrates, is to show the interest of the accused where ineligibility in fact exists. Professor Wigmore, in speaking of the applicability of the rule of con-

venience, says it is "merely a question of policy and fairness based on experience in the different situations." Said amendments are both fair and are based on experience.

That the state might in the exercise of its powers adopt a system or establish a bureau by which all persons who are members of a race ineligible to citizenship, whether native or alien born, should be required to conform to registration laws, and those failing to do so would be presumed to be alien born would be but to adopt an artificial means of doing that which is done in a more direct way by the present law. That the state has not seen fit to adopt one method rather than another, is no concern of courts, unless it has transcended its powers in the premises.

It is not intended by what we have said to extend the rule of convenience or burden of proof to common-law crimes generally designated as *malum in se* nor to all crimes *malum prohibitum*. We go no further than to apply the rule to the particular situation in accordance with the express mandate of said amendments.

■ Appellants complain that the fourth and sixth counts of the indictment rest upon laws which are *ex post facto*, the offenses therein alleged having been committed prior to the adoption of said amendments and statute of 1927. We think there is no merit in this contention. The amendments do not make any act committed prior to the adoption of said amendments and statutes a crime which was innocent if done prior thereto, nor aggravate the crime, nor impose a greater punishment than was annexed to the crime when committed, nor alter the legal rules of evidence and receive less or different testimony than the law required at the time of the commission of the offense. We are of the view that the better reason supports the conclusion that the burden, in cases involving questions of naturalization and alienage, has always been upon the defendant, who has intimate and peculiar knowledge of the fact.

■ Appellants further complain that no specific instruction was given to the jury informing them that the burden was upon the People to prove that Osaki was a member of an alien race ineligible to citizenship. It would have been better practice for the court to have read the law to the jury in full. However, in this case, we are unable to see that the appellants were injured by the failure of the court

to instruct on this issue. As we read the record, the case was tried on the theory that Osaki was of alien, ineligible blood. It was the country of his nativity to which no direct testimony was offered, as well as the denial that he was the owner of or had an interest in the real property described in the indictment which were the issues upon which the case was tried. The jury found Osaki guilty. It could not have done so unless it found also that he was a member of an alien race ineligible to citizenship.

An instruction was read to the jury which was prepared by and given upon the request of *appellants*, as follows, the italics being to call attention to the criticised portion:

"Before you can find either of the defendants in this action guilty of a conspiracy to violate the Alien Land Law, under any of the counts named in the indictment, it must appear from the evidence beyond a reasonable doubt, and to a moral certainty, that some agreement was made or some understanding had by and between the defendant Yoshioka, who is admitted to be an American citizen, and the defendant Osaki, *who is an alien ineligible to citizenship*, under and by which they conspired together to secure leases of agricultural or farming land and property . . . "

Why such an instruction was offered by the appellants, and how it passed the notice of court and counsel for appellants again upon being read to the jury, is not easily understood. If neither the court nor counsel were awakened by the erroneous statement of fact when made, it will not be presumed that the jury was more alert than the trained expounders of the law, but, rather, that the instruction in the respect pointed out, made but little, if any, impression upon anyone.

However this may be, the instructions as a whole, and the admissions and contentions of counsel, make it clear beyond doubt that there was no admission, or claim made that it was an accepted fact, that Osaki was "an alien ineligible to citizenship."

Judgments and orders appealed from are affirmed.

Richards, J., Curtis, J., Shenk, J., Preston, J., Waste, C. J., and Langdon, J., concurred.

On stipulation, ordered that petition for rehearing in above-entitled action may be withdrawn and *remittitur* may issue forthwith.